## SANDIN, UNIT TEAM MANAGER, HALAWA COR-RECTIONAL FACILITY *v.* CONNER ET AL.

No. 93–1911.   Argued February 28, 1995—Decided June 19, 1995

REHNQUIST, C. J., delivered the opinion of the Court, in which O'CONNOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. GINSBURG, J., filed a dissenting opinion, in which STEVENS, J., joined, *post*, p. 488. BREYER, J., filed a dissenting opinion, in which SOUTER, J., joined, *post*, p. 491.

*Steven S. Michaels,* First Deputy Attorney General of Hawaii, argued the cause for petitioner. With him on the briefs were *Margery S. Bronster,* Attorney General of Hawaii, *Robert A. Marks,* former Attorney General, and *Kathleen M. Sato,* Deputy Attorney General.

*Paul L. Hoffman* argued the cause for respondents. With him on the brief was *Gary L. Bostwick.**

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

We granted certiorari to reexamine the circumstances under which state prison regulations afford inmates a liberty interest protected by the Due Process Clause.

I

DeMont Conner was convicted of numerous state crimes, including murder, kidnaping, robbery, and burglary, for which he is currently serving an indeterminate sentence of

---

*Briefs of *amici curiae* urging reversal were filed for the State of New Hampshire et al. by *Jeffrey R. Howard,* Attorney General of New Hampshire, *Douglas N. Jones,* Assistant Attorney General, and *Eleni M. Constantine,* and by the Attorneys General for their respective jurisdictions as follows: *Grant Woods* of Arizona, *Winston Bryant* of Arkansas, *Donald E. Lungren* of California, *Gale A. Norton* of Colorado, *Robert A. Butterworth* of Florida, *Larry EchoHawk* of Idaho, *Roland W. Burris* of Illinois, *Bonnie J. Campbell* of Iowa, *Robert T. Stephan* of Kansas, *Richard P. Ieyoub* of Louisiana, *J. Joseph Curran, Jr.,* of Maryland, *Scott Harshbarger* of Massachusetts, *Hubert H. Humphrey III* of Minnesota, *Mike Moore* of Mississippi, *Jeremiah W. Nixon* of Missouri, *Joseph P. Mazurek* of Montana, *Deborah T. Poritz* of New Jersey, *Frankie Sue Del Papa* of Nevada, *Tom Udall* of New Mexico, *G. Oliver Koppell* of New York, *Michael F. Easley* of North Carolina, *Heidi Heitkamp* of North Dakota, *Lee Fisher* of Ohio, *Susan B. Loving* of Oklahoma, *Theodore R. Kulongoski* of Oregon, *Ernest D. Preate, Jr.,* of Pennsylvania, *T. Travis Medlock* of South Carolina, *Mark Barnett* of South Dakota, *Charles W. Burson* of Tennessee, *Jan Graham* of Utah, *Jeffrey L. Amestoy* of Vermont, *Rosalie S. Ballentine* of the Virgin Islands, *James S. Gilmore III* of Virginia, *Christine O. Gregoire* of Washington, *James E. Doyle* of Wisconsin, and *Joseph B. Meyer* of Wyoming; and for the Criminal Justice Legal Foundation by *Kent S. Scheidegger* and *Charles L. Hobson.*

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Steven R. Shapiro, Carl Varady, Margaret Winter, Elizabeth Alexander,* and *Alvin J. Bronstein;* and for the Edwin F. Mandel Legal Aid Clinic by *Gary H. Palm.*

30 years to life in a Hawaii prison. He was confined in the Halawa Correctional Facility, a maximum security prison in central Oahu. In August 1987, a prison officer escorted him from his cell to the module program area. The officer subjected Conner to a strip search, complete with an inspection of the rectal area. Conner retorted with angry and foul language directed at the officer. Eleven days later he received notice that he had been charged with disciplinary infractions. The notice charged Conner with "high misconduct" for using physical interference to impair a correctional function, and "low moderate misconduct" for using abusive or obscene language and for harassing employees.[1]

Conner appeared before an adjustment committee on August 28, 1987. The committee refused Conner's request to present witnesses at the hearing, stating that "[w]itnesses were unavailable due to move *[sic]* to the medium facility and being short staffed on the modules." App. to Pet. for Cert. A–67. At the conclusion of proceedings, the committee determined that Conner was guilty of the alleged misconduct. It sentenced him to 30 days' disciplinary segregation

---

[1] Hawaii's prison regulations establish a hierarchy of misconduct ranging from "greatest misconduct," Haw. Admin. Rule § 17–201–6(a) (1983), to "minor misconduct," § 17–201–10. Section 17–201–7 enumerates offenses punishable as "high misconduct" and sets available punishment for such offenses at disciplinary segregation up to 30 days or any sanction other than disciplinary segregation. Section 17–201–9 lists offenses punishable as "low moderate misconduct" and sets punishment at disciplinary segregation up to four hours in cell, monetary restitution, or any sanction other than disciplinary segregation. In addition to the levels of misconduct which classify various misdeeds, the regulations also define "serious misconduct" as "that which poses a serious threat to the safety, security, or welfare of the staff, other inmates or wards, or the institution and subjects the individual to the imposition of serious penalties such as segregation for longer than four hours." § 17–201–12. Such misconduct is punished through adjustment committee procedures. *Ibid.* The parties apparently concede that the physical obstruction allegation constituted serious misconduct, but that the low moderate misconduct charges did not.

in the Special Holding Unit[2] for the physical obstruction charge, and four hours segregation for each of the other two charges to be served concurrent with the 30 days. *Id.*, at A–66 to A–67. Conner's segregation began August 31, 1987, and ended September 29, 1987.

Conner sought administrative review within 14 days of receiving the committee's decision. Haw. Admin. Rule § 17–201–20(a) (1983). Nine months later, the deputy administrator found the high misconduct charge unsupported and expunged Conner's disciplinary record with respect to that charge. App. 249. But before the deputy administrator decided the appeal, Conner had brought this suit against the adjustment committee chair and other prison officials in the United States District Court for the District of Hawaii based on Rev. Stat. § 1979, 42 U. S. C. § 1983. His amended complaint prayed for injunctive relief, declaratory relief, and damages for, among other things, a deprivation of procedural due process in connection with the disciplinary hearing. The District Court granted summary judgment in favor of the prison officials.

The Court of Appeals for the Ninth Circuit reversed the judgment. *Conner* v. *Sakai*, 15 F. 3d 1463 (1993). It concluded that Conner had a liberty interest in remaining free from disciplinary segregation and that there was a disputed question of fact with respect to whether Conner received all of the process due under this Court's pronouncement in *Wolff* v. *McDonnell*, 418 U. S. 539 (1974). 15 F. 3d, at 1466. The Court of Appeals based its conclusion on a prison reg-

---

[2] The Special Holding Unit (SHU) houses inmates placed in disciplinary segregation, § 17–201–19(c), administrative segregation, § 17–201–22, and protective custody, § 17–201–23. Single-person cells comprise the SHU and conditions are substantially similar for each of the three classifications of inmates housed there. Compare Exh. 60, 1 App. 142–155, with Exh. 61, 1 App. 156–168. With the exception of one extra phone call and one extra visiting privilege, inmates segregated for administrative reasons receive the same privilege revocations as those segregated for disciplinary reasons.

ulation that instructs the committee to find guilt when a charge of misconduct is supported by substantial evidence. Haw. Admin. Rule § 17–201–18(b)(2) (1983).[3] The Court of Appeals reasoned from *Kentucky Dept. of Corrections* v. *Thompson*, 490 U. S. 454 (1989), that the committee's duty to find guilt was nondiscretionary. From the language of the regulation, it drew a negative inference that the committee may not impose segregation if it does not find substantial evidence of misconduct. 15 F. 3d, at 1466. It viewed this as a state-created liberty interest, and therefore held that respondent was entitled to call witnesses by virtue of our opinion in *Wolff, supra.* We granted the State's petition for certiorari, 513 U. S. 921 (1994), and now reverse.

## II

Our due process analysis begins with *Wolff.* There, Nebraska inmates challenged the decision of prison officials to revoke good time credits without adequate procedures. 418 U. S., at 553. Inmates earned good time credits under a state statute that bestowed mandatory sentence reductions for good behavior, *id.*, at 546, n. 6, revocable only for " 'flagrant or serious misconduct,' " *id.*, at 545, n. 5 (citation omitted). We held that the Due Process Clause itself does not create a liberty interest in credit for good behavior, but that the statutory provision created a liberty interest in a "shortened prison sentence" which resulted from good time

---

[3] The full text of the regulation reads as follows:

"Upon completion of the hearing, the committee may take the matter under advisement and render a decision based upon evidence presented at the hearing to which the individual had an opportunity to respond or any cumulative evidence which may subsequently come to light may be used as a permissible inference of guilt, although disciplinary action shall be based upon more than mere silence. *A finding of guilt shall be made where:*

"(1) The inmate or ward admits the violation or pleads guilty.

"(2) *The charge is supported by substantial evidence.*" Haw. Admin. Rule § 17–201–18(b)(2) (1983) (emphasis added).

credits, credits which were revocable only if the prisoner was guilty of serious misconduct. *Id.*, at 557. The Court characterized this liberty interest as one of "real substance" *ibid.*, and articulated minimum procedures necessary to reach a "mutual accommodation between institutional needs and objectives and the provisions of the Constitution," *id.*, at 556. Much of *Wolff*'s contribution to the landscape of prisoners' due process derived not from its description of liberty interests, but rather from its intricate balancing of prison management concerns with prisoners' liberty in determining the amount of process due. Its short discussion of the definition of a liberty interest, *Wolff, supra*, at 556–558, led to a more thorough treatment of the issue in *Meachum* v. *Fano*, 427 U. S. 215 (1976).

Inmates in *Meachum* sought injunctive relief, declaratory relief, and damages by reason of transfers from a Massachusetts medium security prison to a maximum security facility with substantially less favorable conditions. The transfers were ordered in the aftermath of arson incidents for which the transferred inmates were thought to be responsible, and did not entail a loss of good time credits or any period of disciplinary confinement. *Id.*, at 222. The Court began with the proposition that the Due Process Clause does not protect every change in the conditions of confinement having a substantial adverse impact on the prisoner. *Id.*, at 224. It then held that the Due Process Clause did not itself create a liberty interest in prisoners to be free from intrastate prison transfers. *Id.*, at 225. It reasoned that transfer to a maximum security facility, albeit one with more burdensome conditions, was "within the normal limits or range of custody which the conviction has authorized the State to impose." *Ibid.*; see also *Montanye* v. *Haymes*, 427 U. S. 236, 242 (1976). The Court distinguished *Wolff* by noting that there the protected liberty interest in good time credit had been created by state law; here no comparable Massachusetts law stripped officials of the discretion to transfer prisoners to alternative

facilities "for whatever reason or for no reason at all." *Meachum, supra,* at 228.[4]

Shortly after *Meachum,* the Court embarked on a different approach to defining state-created liberty interests. Because dictum in *Meachum* distinguished *Wolff* by focusing on whether state action was mandatory or discretionary, the Court in later cases laid ever greater emphasis on this somewhat mechanical dichotomy. *Greenholtz* v. *Inmates of Neb. Penal and Correctional Complex,* 442 U. S. 1 (1979), foreshadowed the methodology that would come to full fruition in *Hewitt* v. *Helms,* 459 U. S. 460 (1983). The *Greenholtz* inmates alleged that they had been unconstitutionally denied parole. Their claim centered on a state statute that set the date for discretionary parole at the time the minimum term of imprisonment less good time credits expired. The statute ordered release of a prisoner at that time, unless one of four specific conditions were shown. 442 U. S., at 11. The Court apparently accepted the inmates' argument that the word "shall" in the statute created a legitimate expectation of release absent the requisite finding that one of the justifications for deferral existed, since the Court concluded that some measure of constitutional protection was due. Nevertheless, the State ultimately prevailed because the minimal process it had awarded the prisoners was deemed sufficient under the Fourteenth Amendment.

---

[4] Later cases, such as *Vitek* v. *Jones,* 445 U. S. 480 (1980), found that the Due Process Clause itself confers a liberty interest in certain situations. In *Vitek,* a prisoner was to be transferred involuntarily to a state mental hospital for treatment of a mental disease or defect; the Court held that his right to be free from such transfer was a liberty interest irrespective of state regulation; it was "qualitatively different" from the punishment characteristically suffered by a person convicted of crime, and had "stigmatizing consequences." *Id.,* at 493–494. *Washington* v. *Harper,* 494 U. S. 210, 221–222 (1990), likewise concluded that, independent of any state regulation, an inmate had a liberty interest in being protected from the involuntary administration of psychotropic drugs.

The Court made explicit in *Hewitt* what was implicit in *Greenholtz*. In evaluating the claims of inmates who had been confined to administrative segregation, it first rejected the inmates' claim of a right to remain in the general population as protected by the Due Process Clause on the authority of *Meachum, Montanye,* and *Vitek.* The Due Process Clause standing alone confers no liberty interest in freedom from state action taken "'within the sentence imposed.'" 459 U. S., at 468. It then concluded that the transfer to less amenable quarters for nonpunitive reasons was "ordinarily contemplated by a prison sentence." *Ibid.* Examination of the possibility that the State had created a liberty interest by virtue of its prison regulations followed. Instead of looking to whether the State created an interest of "real substance" comparable to the good time credit scheme of *Wolff,* the Court asked whether the State had gone beyond issuing mere procedural guidelines and had used "language of an unmistakably mandatory character" such that the incursion on liberty would not occur "absent specified substantive predicates." *Id.,* at 471–472. Finding such mandatory directives in the regulations before it, the Court decided that the State had created a protected liberty interest. It nevertheless, held, as it had in *Greenholtz,* that the full panoply of procedures conferred in *Wolff* were unnecessary to safeguard the inmates' interest and, if imposed, would undermine the prison's management objectives.

As this methodology took hold, no longer did inmates need to rely on a showing that they had suffered a "'grievous loss'" of liberty retained even after sentenced to terms of imprisonment. *Morrissey* v. *Brewer,* 408 U. S. 471, 481 (1972) (citation omitted). For the Court had ceased to examine the "nature" of the interest with respect to interests allegedly created by the State. See *ibid.; Board of Regents of State Colleges* v. *Roth,* 408 U. S. 564, 571 (1972). In a series of cases since *Hewitt,* the Court has wrestled with the language of intricate, often rather routine prison guidelines

to determine whether mandatory language and substantive predicates created an enforceable expectation that the State would produce a particular outcome with respect to the prisoner's conditions of confinement.

In *Olim* v. *Wakinekona*, 461 U. S. 238 (1983), the claimants identified prison regulations that required a particular kind of hearing before the prison administrator could, in his discretion, effect an interstate transfer to another prison. Parsing the language of the regulation led the Court to hold that the discretionary nature of the transfer decision negated any state-created liberty interest. *Id.*, at 249–250. *Kentucky Dept. of Corrections* v. *Thompson*, 490 U. S. 454 (1989), dealt with regulations governing the visitation privileges of inmates. Asserting that a regulation created an absolute right to visitors absent a finding of certain substantive predicates, the inmates sought review of the adequacy of the procedures. As in *Wakinekona*, the Court determined the regulation left visitor exclusion to the discretion of the officials, and refused to elevate such expectations to the level of a liberty interest. 490 U. S., at 464–465.

By shifting the focus of the liberty interest inquiry to one based on the language of a particular regulation, and not the nature of the deprivation, the Court encouraged prisoners to comb regulations in search of mandatory language on which to base entitlements to various state-conferred privileges. Courts have, in response, and not altogether illogically, drawn negative inferences from mandatory language in the text of prison regulations. The Court of Appeals' approach in this case is typical: It inferred from the mandatory directive that a finding of guilt "shall" be imposed under certain conditions the conclusion that the absence of such conditions prevents a finding of guilt.

Such a conclusion may be entirely sensible in the ordinary task of construing a statute defining rights and remedies available to the general public. It is a good deal less sensible in the case of a prison regulation primarily designed to

guide correctional officials in the administration of a prison. Not only are such regulations not designed to confer rights on inmates, but the result of the negative implication jurisprudence is not to require the prison officials to follow the negative implication drawn from the regulation, but is instead to attach procedural protections that may be of quite a different nature. Here, for example, the Court of Appeals did not hold that a finding of guilt could *not* be made in the *absence* of substantial evidence. Instead, it held that the "liberty interest" created by the regulation entitled the inmate to the procedural protections set forth in *Wolff.*

*Hewitt* has produced at least two undesirable effects. First, it creates disincentives for States to codify prison management procedures in the interest of uniform treatment. Prison administrators need be concerned with the safety of the staff and inmate population. Ensuring that welfare often leads prison administrators to curb the discretion of staff on the front line who daily encounter prisoners hostile to the authoritarian structure of the prison environment. Such guidelines are not set forth solely to benefit the prisoner. They also aspire to instruct subordinate employees how to exercise discretion vested by the State in the warden, and to confine the authority of prison personnel in order to avoid widely different treatment of similar incidents. The approach embraced by *Hewitt* discourages this desirable development: States may avoid creation of "liberty" interests by having scarcely any regulations, or by conferring standardless discretion on correctional personnel.

Second, the *Hewitt* approach has led to the involvement of federal courts in the day-to-day management of prisons, often squandering judicial resources with little offsetting benefit to anyone. In so doing, it has run counter to the view expressed in several of our cases that federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment. *Wolff,* 418 U. S., at 561–563; *Hewitt,* 459 U. S., at 470–471; *Jones* v. *North Carolina Prisoners' Labor Union, Inc.,* 433 U. S. 119,

125 (1977). Such flexibility is especially warranted in the fine-tuning of the ordinary incidents of prison life, a common subject of prisoner claims since *Hewitt.* See, *e. g., Klos* v. *Haskell,* 48 F. 3d 81, 82 (CA2 1995) (claiming liberty interest in right to participate in "shock program"—a type of boot camp for inmates); *Segal* v. *Biller,* No. 94–35448, 1994 U. S. App. LEXIS 30628 (CA9, Oct. 31, 1994) (unpublished) (claiming liberty interest in a waiver of the travel limit imposed on prison furloughs); *Burgin* v. *Nix,* 899 F. 2d 733, 735 (CA8 1990) (claiming liberty interest in receiving a tray lunch rather than a sack lunch); *Spruytte* v. *Walters,* 753 F. 2d 498, 506–508 (CA6 1985) (finding liberty interest in receiving a paperback dictionary due to a rule that states a prisoner " 'may receive any book . . . which does not present a threat to the order or security of the institution' ") (citation omitted); *Lyon* v. *Farrier,* 727 F. 2d 766, 768–769 (CA8 1984) (claiming liberty interest in freedom from transfer to a smaller cell without electrical outlets for televisions and liberty interest in a prison job); *United States* v. *Michigan,* 680 F. Supp. 270, 277 (WD Mich. 1988) (finding liberty interest in not being placed on food loaf diet).

In light of the above discussion, we believe that the search for a negative implication from mandatory language in prisoner regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause. The time has come to return to the due process principles we believe were correctly established and applied in *Wolff* and *Meachum.*[5] Following *Wolff,* we recognize that States

---

[5] Such abandonment of *Hewitt's* methodology does not technically require us to overrule any holding of this Court. The Court in *Olim* v. *Wakinekona,* 461 U. S. 238 (1983), and *Kentucky Dept. of Corrections* v. *Thompson,* 490 U. S. 454 (1989), concluded no liberty interest was at stake. Although it did locate a liberty interest in *Hewitt,* it concluded that due process required no additional procedural guarantees for the inmate. As such, its answer to the anterior question of whether the inmate possessed a liberty interest at all was unnecessary to the disposition of the case. Our decision today only abandons an approach that in practice is difficult to administer and which produces anomalous results.

may under certain circumstances create liberty interests which are protected by the Due Process Clause. See also *Board of Pardons* v. *Allen*, 482 U. S. 369 (1987). But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, see, *e. g.*, *Vitek*, 445 U. S., at 493 (transfer to mental hospital), and *Washington*, 494 U. S., at 221–222 (involuntary administration of psychotropic drugs), nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

Conner asserts, incorrectly, that any state action taken for a punitive reason encroaches upon a liberty interest under the Due Process Clause even in the absence of any state regulation. Neither *Bell* v. *Wolfish*, 441 U. S. 520 (1979), nor *Ingraham* v. *Wright*, 430 U. S. 651 (1977), requires such a rule. *Bell* dealt with the interests of pretrial detainees and not convicted prisoners. See also *United States* v. *Salerno*, 481 U. S. 739, 747 (1987) (distinguishing between "impermissible punishment" and "permissible regulation" of pretrial detainees). The Court in *Bell* correctly noted that a detainee "may not be punished prior to an adjudication of guilt ᾽ in accordance with due process of law." 441 U. S., at 535. The Court expressed concern that a State would attempt to punish a detainee for the crime for which he was indicted via preconviction holding conditions. *Id.*, at 539. Such a course would improperly extend the legitimate reasons for which such persons are detained—to ensure their presence at trial.[6]

---

[6] Similar concerns drove the conclusion in *Kennedy* v. *Mendoza-Martinez*, 372 U. S. 144 (1963), holding that free citizens must receive procedural protections prior to revocation of citizenship for draft evasion. Without discussing "liberty interests," the Court recognized that deprivation of the "most precious right" of citizenship necessitated process by way of jury trial under the Fifth and Sixth Amendments. *Id.*, at 159. As in *Bell*, the Court feared the Government would enforce the criminal

The same distinction applies to *Ingraham*, which addressed the rights of schoolchildren to remain free from arbitrary corporal punishment. The Court noted that the Due Process Clause historically encompassed the notion that the State could not "physically punish an individual except in accordance with due process of law" and so found schoolchildren sheltered. 430 U. S., at 674. Although children sent to public school are lawfully confined to the classroom, arbitrary corporal punishment represents an invasion of personal security to which their parents do not consent when entrusting the educational mission to the State.

The punishment of incarcerated prisoners, on the other hand, serves different aims than those found invalid in *Bell* and *Ingraham*. The process does not impose retribution in lieu of a valid conviction, nor does it maintain physical control over free citizens forced by law to subject themselves to state control over the educational mission. It effectuates prison management and prisoner rehabilitative goals. See *State* v. *Alvey*, 67 Haw. 49, 55, 678 P. 2d 5, 9 (1984). Admittedly, prisoners do not shed all constitutional rights at the prison gate, *Wolff*, 418 U. S., at 555, but " '[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' " *Jones*, 433 U. S., at 125, quoting *Price* v. *Johnston*, 334 U. S. 266, 285 (1948). Discipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law.

This case, though concededly punitive, does not present a dramatic departure from the basic conditions of Conner's indeterminate sentence. Although Conner points to dicta in cases implying that solitary confinement automatically triggers due process protection, *Wolff, supra*, at 571, n. 19; *Baxter* v. *Palmigiano*, 425 U. S. 308, 323 (1976) (assuming with-

---

law punishing draft evasion through the back door of denaturalization without prosecution for said crimes. 372 U. S., at 186.

out deciding that freedom from punitive segregation for "'serious misconduct'" implicates a liberty interest, holding only that the prisoner has no right to counsel) (citation omitted), this Court has not had the opportunity to address in an argued case the question whether disciplinary confinement of inmates itself implicates constitutional liberty interests. We hold that Conner's discipline in segregated confinement did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest. The record shows that, at the time of Conner's punishment, disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody.[7] We note also that the State expunged Conner's disciplinary record with respect to the "high misconduct" charge nine months after Conner served time in segregation. Thus, Conner's confinement did not exceed similar, but totally discretionary, confinement in either duration or degree of restriction. Indeed, the conditions at Halawa involve significant amounts of "lockdown time" even for inmates in the general population.[8] Based on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing him there for 30 days did not work a major disruption in his environment.[9]

---

[7] Hawaii has repealed the regulations describing the structure of inmate privileges in the SHU when confined in administrative segregation, Brief for Petitioner 6, n. 3, but it retains inmate classification category "Maximum Custody I" in which inmate privileges are comparably limited. App. to Brief for Petitioner 48a–71a.

[8] General population inmates are confined to cells for anywhere between 12 and 16 hours a day, depending on their classification. 1 App. 126.

[9] The State notes, ironically, that Conner requested that he be placed in protective custody after he had been released from disciplinary segregation. *Id.*, at 43. Conner's own expectations have at times reflected a personal preference for the quietude of the SHU. Although we do not think a prisoner's subjective expectation is dispositive of the liberty inter-

Nor does Conner's situation present a case where the State's action will inevitably affect the duration of his sentence. Nothing in Hawaii's code requires the parole board to deny parole in the face of a misconduct record or to grant parole in its absence, Haw. Rev. Stat. §§ 353–68, 353–69 (1985), even though misconduct is by regulation a relevant consideration, Haw. Admin. Rule § 23–700–33(b) (effective Aug. 1992). The decision to release a prisoner rests on a myriad of considerations. And, the prisoner is afforded procedural protection at his parole hearing in order to explain the circumstances behind his misconduct record. Haw. Admin. Rule §§ 23–700–31(a), 23–700–35(c), 23–700–36 (1983). The chance that a finding of misconduct will alter the balance is simply too attenuated to invoke the procedural guarantees of the Due Process Clause. The Court rejected a similar claim in *Meachum*, 427 U. S., at 229, n. 8 (declining to afford relief on the basis that petitioner's transfer record might affect his future confinement and possibility of parole).[10]

We hold, therefore, that neither the Hawaii prison regulation in question, nor the Due Process Clause itself, afforded Conner a protected liberty interest that would entitle him to the procedural protections set forth in *Wolff*. The regime to which he was subjected as a result of the misconduct hearing was within the range of confinement to be normally expected for one serving an indeterminate term of 30 years to life.[11]

---

est analysis, it does provide some evidence that the conditions suffered were expected within the contour of the actual sentence imposed.

[10] Again, we note that Hawaii expunged Conner's record with respect to the "high misconduct" charge, so he personally has no chance of receiving a delayed release from the parole board as a direct result of that allegation.

[11] Prisoners such as Conner, of course, retain other protection from arbitrary state action even within the expected conditions of confinement. They may invoke the First and Eighth Amendments and the Equal Protec-

The judgment of the Court of Appeals is accordingly

*Reversed.*

JUSTICE GINSBURG, with whom JUSTICE STEVENS joins, dissenting.

Respondent DeMont Conner is a prisoner in a maximum-security Hawaii prison. After Conner reacted angrily to a strip search, a misconduct report charged him with obstructing the performance of a correctional officer's duties, using abusive language when talking to a staff member, and harassing a staff member. Conner received notice of the charges and had an opportunity, personally, to answer them. However, the disciplinary committee denied his request to call as witnesses staff members he said would attest to his innocence.

Conner contested the misconduct charges, but, according to the report of the disciplinary committee, he admitted his hesitation to follow orders and his use of profanity during the search. Based on Conner's statement to the committee, and on written statements submitted by the officer who conducted the search and his supervisor, the committee found Conner guilty of all charges. Sentenced to 30 days in the prison's segregation unit, Conner pursued an administrative appeal, which ultimately resulted in reversal of the obstruction conviction.

Unlike the Court, I conclude that Conner had a liberty interest, protected by the Fourteenth Amendment's Due Process Clause, in avoiding the disciplinary confinement he endured. As JUSTICE BREYER details, Conner's prison punishment effected a severe alteration in the conditions of his incarceration. See *post*, at 494. Disciplinary confine-

tion Clause of the Fourteenth Amendment where appropriate, and may draw upon internal prison grievance procedures and state judicial review where available.

ment as punishment for "high misconduct" not only deprives prisoners of privileges for protracted periods; unlike administrative segregation and protective custody, disciplinary confinement also stigmatizes them and diminishes parole prospects. Those immediate and lingering consequences should suffice to qualify such confinement as liberty depriving for purposes of Due Process Clause protection. See *Meachum* v. *Fano*, 427 U. S. 215, 234–235 (1976) (STEVENS, J., dissenting).[1]

I see the Due Process Clause itself, not Hawaii's prison code, as the wellspring of the protection due Conner. Deriving protected liberty interests from mandatory language in local prison codes would make of the fundamental right something more in certain States, something less in others. Liberty that may vary from Ossining, New York, to San Quentin, California, does not resemble the "Liberty" enshrined among "unalienable Rights" with which all persons are "endowed by their Creator." Declaration of Independence; see *Meachum*, 427 U. S., at 230 (STEVENS, J., dissenting) ("[T]he Due Process Clause protects [the unalienable liberty recognized in the Declaration of Independence] rather

---

[1] The Court reasons that Conner's disciplinary confinement, "with insignificant exceptions, mirrored th[e] conditions imposed upon inmates in administrative segregation and protective custody," *ante*, at 486, and therefore implicated no constitutional liberty interest. But discipline means punishment for misconduct; it rests on a finding of wrongdoing that can adversely affect an inmate's parole prospects. Disciplinary confinement therefore cannot be bracketed with administrative segregation and protective custody, both measures that carry no long-term consequences. The Court notes, however, that the State eventually expunged Conner's disciplinary record, *ibid.*, as a result of his successful administrative appeal. But hindsight cannot tell us whether a liberty interest existed at the outset. One must, of course, know at the start the character of the interest at stake in order to determine *then* what process, if any, is constitutionally due. "All's well that ends well" cannot be the measure here.

than the particular rights or privileges conferred by specific laws or regulations.").[2]

Deriving the prisoner's due process right from the code for his prison, moreover, yields this practical anomaly: a State that scarcely attempts to control the behavior of its prison guards may, for that very laxity, escape constitutional accountability; a State that tightly cabins the discretion of its prison workers may, for that attentiveness, become vulnerable to constitutional claims. An incentive for ruleless prison management disserves the State's penological goals and jeopardizes the welfare of prisoners.

To fit the liberty recognized in our fundamental instrument of government, the process due by reason of the Constitution similarly should not depend on the particularities of the local prison's code. Rather, the basic, universal requirements are notice of the acts of misconduct prison officials say the inmate committed, and an opportunity to respond to the charges before a trustworthy decisionmaker. See generally Friendly, "Some Kind of Hearing," 123 U. Pa. L. Rev. 1267, 1278–1281 (1975) (an unbiased tribunal, notice of the proposed government action and the grounds asserted for it, and an opportunity to present reasons why the proposed action should not be taken are fundamental; additional safeguards depend on the importance of the private interest, the utility of the particular safeguards, and the burden of affording them).

---

[2] The Court describes a category of liberty interest that is something less than the one the Due Process Clause itself shields, something more than anything a prison code provides. The State may create a liberty interest, the Court tells us, when "atypical and significant hardship [would be borne by] the inmate in relation to the ordinary incidents of prison life." *Ante,* at 484; see *ante,* at 486. What design lies beneath these key words? The Court ventures no examples, leaving consumers of the Court's work at sea, unable to fathom what would constitute an "atypical, significant deprivation," *ibid.,* and yet not trigger protection under the Due Process Clause directly.

For the reasons JUSTICE BREYER cogently presents, see *post*, at 504, a return of this case to the District Court would be unavoidable if it were recognized that Conner was deprived of liberty within the meaning of the Due Process Clause. But upon such a return, a renewed motion for summary judgment would be in order, for the record, as currently composed, does not show that Conner was denied any procedural protection warranted in his case.

In particular, a call for witnesses is properly refused when the projected testimony is not relevant to the matter in controversy. See *Wolff* v. *McDonnell,* 418 U. S. 539, 566 (1974) (justifications for a prison tribunal's refusing to hear witnesses are "irrelevance, lack of necessity, [and] the hazards [to institutional safety or correctional goals] presented in individual cases"). Unless Conner were to demonstrate, in face of the disciplinary committee's stated reliance on his own admissions, that an issue of material fact is genuinely in controversy, see Fed. Rules Civ. Proc. 56(c), (e), his due process claim would fail.

\* \* \*

Because I conclude that Conner was deprived of liberty within the meaning of the Due Process Clause, I dissent from the judgment of the Court. I would return the case for a precisely focused determination whether Conner received the process that was indeed due.

JUSTICE BREYER, with whom JUSTICE SOUTER joins, dissenting.

The specific question in this case is whether a particular punishment that, among other things, segregates an inmate from the general prison population for violating a disciplinary rule deprives the inmate of "liberty" within the terms of the Fourteenth Amendment's Due Process Clause. The majority, asking whether that punishment "imposes atypical and significant hardship on the inmate in relation to the ordi-

nary incidents of prison life," *ante*, at 484, concludes that it does not do so. The majority's reasoning, however, particularly when read in light of this Court's precedents, seems to me to lead to the opposite conclusion. And, for that reason, I dissent.

I

The respondent, DeMont Conner, is an inmate at Halawa Correctional Facility, a maximum security prison in Hawaii. In August 1987, as a result of an altercation with a guard, prison authorities charged Conner with violating several prison disciplinary regulations, including one that prohibited "physical interference . . . resulting in the obstruction . . . of the performance of a correctional function. . . ." Haw. Admin. Rule § 17–201–7 (14) (1983). The prison's "adjustment committee" found Conner "guilty" and imposed a punishment of 30 days of "disciplinary segregation." Eventually, but after Conner had served the 30 days, a review official in the prison set aside the committee's determination, and expunged it from Conner's record.

In the meantime, Conner had brought this "civil rights" action in Federal District Court in Hawaii. See Rev. Stat. § 1979, 42 U. S. C. § 1983. He claimed, among other things, that the adjustment committee's failure to let him call certain witnesses had deprived him of his "liberty . . . without due process of law." U. S. Const., Amdt. 14, § 1. The District Court granted summary judgment for the prison officials. But, the Ninth Circuit agreed with Conner that the committee's punishment had deprived him of procedurally protected "liberty." 15 F. 3d 1463, 1466 (1993). It remanded the case to the District Court to determine whether the refusal to allow Conner to call the particular witnesses denied him of the process he was "due." See Part V, *infra*.

The issue before this Court is whether Conner's particular punishment amounted to a deprivation of Conner's "liberty" within the meaning of the Due Process Clause.

## II

The Fourteenth Amendment says that a State shall not "deprive any person of life, liberty, or property, without due process of law." U. S. Const., Amdt. 14, § 1. In determining whether state officials have deprived an inmate, such as Conner, of a procedurally protected "liberty," this Court traditionally has looked either (1) to the nature of the deprivation (how severe, in degree or kind) or (2) to the State's rules governing the imposition of that deprivation (whether they, in effect, give the inmate a "right" to avoid it). See, *e. g., Kentucky Dept. of Corrections* v. *Thompson*, 490 U. S. 454, 460–461, 464–465 (1989). Thus, this Court has said that certain changes in conditions may be so severe or so different from ordinary conditions of confinement that, whether or not state law gives state authorities broad discretionary power to impose them, the state authorities may not do so "without complying with minimum requirements of due process." *Vitek* v. *Jones*, 445 U. S. 480, 491–494 (1980) ("involuntary commitment to a mental hospital"); *Washington* v. *Harper*, 494 U. S. 210, 221–222 (1990) ("unwanted administration of antipsychotic drugs"). The Court has also said that deprivations that are less severe or more closely related to the original terms of confinement nonetheless will amount to deprivations of procedurally protected liberty, provided that state law (including prison regulations) narrowly cabins the legal power of authorities to impose the deprivation (thereby giving the inmate a kind of right to avoid it). See *Hewitt* v. *Helms*, 459 U. S. 460, 471–472 (1983) (liberty interest created by regulations "requiring . . . that administrative segregation will not occur absent specified substantive predicates"); *Thompson, supra,* at 461 ("method of inquiry . . . always has been to examine closely the language of the relevant statutes and regulations"); *Board of Pardons* v. *Allen*, 482 U. S. 369, 382 (1987) (O'CONNOR, J., dissenting) (insisting upon "standards that place real limits on decisionmaker discretion");

*Olim* v. *Wakinekona,* 461 U. S. 238, 248–249 (1983) (existence of liberty interest regarding interstate prison transfers depends upon state regulations); *Montanye* v. *Haymes,* 427 U. S. 236, 242 (1976) (same for intrastate prison transfers); *Meachum* v. *Fano,* 427 U. S. 215, 225–227 (1976) (same).

If we apply these general pre-existing principles to the relevant facts before us, it seems fairly clear, as the Ninth Circuit found, that the prison punishment here at issue deprived Conner of constitutionally protected "liberty." For one thing, the punishment worked a fairly major change in Conner's conditions. In the absence of the punishment, Conner, like other inmates in Halawa's general prison population would have left his cell and worked, taken classes, or mingled with others for eight *hours* each day. See Exh. 36, App. 126; Exh. 6, *id.,* at 101. As a result of disciplinary segregation, however, Conner, for 30 days, had to spend his entire time alone in his cell (with the exception of 50 *minutes* each day on average for brief exercise and shower periods, during which he nonetheless remained isolated from other inmates and was constrained by leg irons and waist chains). See Exh. 61, *id.,* at 156–157, 166. Cf. *Hughes* v. *Rowe,* 449 U. S. 5, 9, 11 (1980) *(per curiam)* (disciplinary "[s]egregation of a prisoner without a prior hearing may violate due process if the postponement of procedural protections is not justified by apprehended emergency conditions"); *Wolff* v. *McDonnell,* 418 U. S. 539, 552, n. 9, 571–572, n. 19 (1974) ("solitary confinement"—*i. e.,* segregation "in the usual 'disciplinary cell'" or a "'dry cell'"—"represents a major change in the conditions of confinement"); *Baxter* v. *Palmigiano,* 425 U. S. 308, 323 (1976) (segregation for "'serious misconduct'" triggers due process protection) (citation omitted).

Moreover, irrespective of whether this punishment amounts to a deprivation of liberty *independent* of state law, here the prison's own disciplinary rules severely cabin the authority of prison officials to impose this kind of punishment. They provide (among other things):

(a) that certain specified acts shall constitute *"high misconduct,"* Haw. Admin. Rule § 17–201–7a (1983) (emphasis added);

(b) that misconduct punishable by more than four hours in disciplinary segregation "shall be punished" through a prison "adjustment committee" (composed of three unbiased members), §§ 17–201–12, 13;

(c) that, when an inmate is charged with such misconduct, then (after notice and a hearing) "[a] finding of guilt shall be made" if the charged inmate admits guilt or the "charge is supported by substantial evidence," §§ 17–201–18(b), (b)(2); see §§ 17–201–16, 17; and

(d) that the "[s]anctions" for high misconduct that "may be imposed as punishment . . . shall include . . . [d]isciplinary segregation up to thirty days," § 17–201–7(b).

The prison rules thus: (1) impose a punishment that is substantial, (2) restrict its imposition as a punishment to instances in which an inmate has committed a defined offense, and (3) prescribe nondiscretionary standards for determining whether or not an inmate committed that offense. Accordingly, under this Court's liberty-defining standards, imposing the punishment would "deprive" Conner of "liberty" within the meaning of the Due Process Clause. Compare *Hewitt* v. *Helms, supra,* at 471–472 (liberty interest created by regulations "requiring that . . . administrative segregation will not occur absent specified substantive predicates"), with *Thompson,* 490 U. S., at 457, n. 2 (no liberty interest created by regulations which gave officials broad discretion to refuse a visit whenever "there are reasonable grounds to believe that," among other things, "[t]he visit will be detrimental to the inmate's rehabilitation"). Thus, under existing law, the Ninth Circuit correctly decided that the punishment deprived Conner of procedurally protected liberty and that the District Court should go on to decide whether or not the

prison's procedures provided Conner with the "process" that is "due."

## III

The majority, while not disagreeing with this summary of pre-existing law, seeks to change, or to clarify, that law's "liberty" defining standards in one important respect. The majority believes that the Court's present "cabining of discretion" standard reads the Constitution as providing procedural protection for trivial "rights," as, for example, where prison rules set forth specific standards for the content of prison meals. *Ante*, at 482–483. It adds that this approach involves courts too deeply in routine matters of prison administration, all without sufficient justification. *Ante*, at 482. It therefore imposes a minimum standard, namely, that a deprivation falls within the Fourteenth Amendment's definition of "liberty" only if it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Ante*, at 484, 486.

I am not certain whether or not the Court means this standard to change prior law radically. If so, its generality threatens the law with uncertainty, for some lower courts may read the majority opinion as offering significantly less protection against deprivation of liberty, while others may find in it an extension of protection to certain "atypical" hardships that pre-existing law would not have covered. There is no need, however, for a radical reading of this standard, nor any other significant change in present law, to achieve the majority's basic objective, namely, to read the Constitution's Due Process Clause to protect inmates against deprivations of freedom that are important, not comparatively insignificant. Rather, in my view, this concern simply requires elaborating, and explaining, the Court's present standards (without radical revision) in order to make clear that courts must apply them in light of the purposes they were meant to serve. As so read, the standards will not

create procedurally protected"liberty" interests where only minor matters are at stake.

Three sets of considerations, taken together, support my conclusion that the Court need not (and today's generally phrased minimum standard therefore does not) significantly revise current doctrine by deciding to remove minor prison matters from federal-court scrutiny. First, although this Court has said, and continues to say, that *some* deprivations of an inmate's freedom are so severe in kind or degree (or so far removed from the original terms of confinement) that they amount to deprivations of liberty, irrespective of whether state law (or prison rules) "cabin discretion," *e. g., ante,* at 483–484; *Vitek* v. *Jones,* 445 U. S., at 491–494; *Washington* v. *Harper,* 494 U. S., at 221–222; cf. *Joint Anti-Fascist Refugee Comm.* v. *McGrath,* 341 U. S. 123, 168 (1951) (Frankfurter, J., concurring), it is not easy to specify just *when,* or *how much* of, a loss triggers this protection. There is a broad middle category of imposed restraints or deprivations that, considered by themselves, are neither obviously so serious as to fall within, nor obviously so insignificant as to fall without, the Clause's protection.

Second, the difficult line-drawing task that this middle category implies helps to explain why this Court developed its additional liberty-defining standard, which looks to local law (examining whether that local law creates a "liberty" by significantly limiting the discretion of local authorities to impose a restraint). See, *e. g., Thompson, supra,* at 461; *Hewitt,* 459 U. S., at 471–472. Despite its similarity to the way in which the Court determines the existence, or nonexistence, of "property" for Due Process Clause purposes, the justification for looking at local law is not the same in the prisoner liberty context. In protecting property, the Due Process Clause often aims to protect *reliance,* say, reliance upon an "entitlement" that local (*i. e.,* nonconstitutional) law itself has created or helped to define. See *Board of Regents of State Colleges* v. *Roth,* 408 U. S. 564, 577 (1972) ("It is a purpose of

the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined"). In protecting liberty, however, the Due Process Clause protects, not this kind of reliance upon a government-conferred benefit, but rather an absence of government restraint, the very absence of restraint that we call freedom. Cf. *Meachum*, 427 U. S., at 230–231 (STEVENS, J., dissenting) (citing *Morrissey* v. *Brewer*, 408 U. S. 471, 482 (1972)).

Nevertheless, there are several *other* important reasons, in the prison context, to consider the provisions of state law. The fact that a further deprivation of an inmate's freedom takes place under local rules that cabin the authorities' discretionary power to impose the restraint suggests, *other things being equal*, that the matter is more likely to have played an important role in the life of the inmate. Cf. *Hewitt, supra*, at 488 (STEVENS, J., dissenting). It suggests, other things being equal, that the matter is more likely of a kind to which procedural protections historically have applied, and where they normally prove useful, for such rules often *single out* an inmate and condition a deprivation upon the existence, or nonexistence, of particular facts. Cf. *Thompson*, 490 U. S., at 468–470 (Marshall, J., dissenting); *United States* v. *Florida East Coast R. Co.*, 410 U. S. 224, 244–245 (1973). It suggests, other things being equal, that the matter will not involve highly judgmental administrative matters that call for the wise exercise of discretion—matters where courts reasonably should hesitate to second-guess prison administrators. See *Meachum, supra*, at 225. It suggests, other things being equal, that the inmate will have thought that he himself, through control of his own behavior, could have avoided the deprivation, and thereby have believed that (in the absence of his misbehavior) the restraint fell outside the "sentence imposed" upon him. Cf. *Thompson*, 490 U. S., at 464–465. Finally, courts can identify the presence or absence of cabined discretion fairly easily and

objectively, at least much of the time. Cf. *id.*, at 461. These characteristics of "cabined discretion" mean that courts can use it as a kind of touchstone that can help them, when they consider the broad middle category of prisoner restraints, to separate those kinds of restraints that, in general, are more likely to call for constitutionally guaranteed procedural protection, from those that more likely do not. Given these reasons and the precedent, I believe courts will continue to find this touchstone helpful as they seek to apply the majority's middle category standard.

Third, there is, therefore, no need to apply the "discretion-cabining" approach—the basic purpose of which is to provide a somewhat more objective method for identifying deprivations of protected "liberty" within a broad middle range of prisoner restraints—where a deprivation is unimportant enough (or so similar in nature to ordinary imprisonment) that it rather clearly falls *outside* that middle category. Prison, by design, restricts the inmates' freedom. And, one cannot properly view unimportant matters that happen to be the subject of prison regulations as substantially aggravating a loss that has already occurred. Indeed, a regulation about a minor matter, for example, a regulation that seems to cabin the discretionary power of a prison administrator to deprive an inmate of, say, a certain kind of lunch, may amount simply to an instruction to the administrator about how to do his job, rather than a guarantee to the inmate of a "right" to the status quo. Cf. *Colon* v. *Schneider*, 899 F. 2d 660, 668 (CA7 1990) (rules governing use of Mace to subdue inmates "directed toward the prison staff, not the inmates"). Thus, this Court has never held that comparatively unimportant prisoner "deprivations" fall within the scope of the Due Process Clause even if local law limits the authority of prison administrators to impose such minor deprivations. See *Thompson, supra,* at 461, n. 3 (leaving question open). And, in my view, it should now simply specify that they do not.

I recognize that, as a consequence, courts must separate the unimportant from the potentially significant, without the help of the more objective "discretion-cabining" test. Yet, making that judicial judgment seems no more difficult than many other judicial tasks. See *Goss* v. *Lopez*, 419 U. S. 565, 576 (1975) (*"de minimis"* line defining property interests under the Due Process Clause). It seems to me possible to separate less significant matters such as television privileges, "sack" versus "tray" lunches, playing the state lottery, attending an ex-stepfather's funeral, or the limits of travel when on prison furlough, *e. g., Lyon* v. *Farrier*, 727 F. 2d 766, 768–769 (CA8 1984); *Burgin* v. *Nix*, 899 F. 2d 733, 734–735 (CA8 1990) *(per curiam); Hatch* v. *Sharp*, 919 F. 2d 1266, 1270 (CA7 1990); *Merritt* v. *Broglin*, 891 F. 2d 169, 173–174 (CA7 1989); *Segal* v. *Biller*, No. 94–35448, 1994 U. S. App. LEXIS 30628, *4–*5 (CA9, Oct. 31, 1994) (unpublished), from more significant matters, such as the solitary confinement at issue here. Indeed, prison regulations themselves may help in this respect, such as the regulations here which separate (from more serious matters) "low moderate" and "minor" misconduct. Compare, on the one hand, the maximum punishment for "moderate" misconduct of two weeks of disciplinary segregation, Haw. Admin. Rule § 17–201–8 (1983), with the less severe maximum punishments, on the other hand, for "low moderate" and "minor" misconduct, §§ 17–201–9, 10 (several hours of disciplinary segregation and "[l]oss of privileges" such as "community recreation; commissary; snacks; cigarettes, smoking; personal visits—no longer than fifteen days; personal correspondence; personal phone calls for not longer than fifteen days"; impounding personal property; extra duty; and reprimand).

The upshot is the following: the problems that the majority identifies suggest that this Court should make explicit the lower definitional limit, in the prison context, of "liberty" under the Due Process Clause—a limit that is already implicit in this Court's precedent. See *Morrissey* v. *Brewer*,

408 U. S., at 481 ("'grievous loss'") (citations omitted). Those problems do not require abandoning that precedent. *Kentucky Dept. of Corrections* v. *Thompson, supra; Olim* v. *Wakinekona,* 461 U. S. 238 (1983); *Hewitt* v. *Helms,* 459 U. S. 460 (1983); *Meachum* v. *Fano,* 427 U. S. 215 (1976); *Montanye* v. *Haymes,* 427 U. S. 236 (1976).

## IV

The Court today reaffirms that the "liberty" protected by the Fourteenth Amendment includes interests that state law may create. *Ante,* at 483–484. It excludes relatively minor matters from that protection. *Ante,* at 484 (requiring "atypical and significant hardship on the inmate"). And, it does not question the vast body of case law, including cases from this Court and every Circuit, recognizing that segregation can deprive an inmate of constitutionally protected "liberty." See, *e. g., Hewitt, supra,* at 472; *Rodi* v. *Ventetuolo,* 941 F. 2d 22, 28 (CA1 1991); *Soto* v. *Walker,* 44 F. 3d 169, 172 (CA2 1995); *Layton* v. *Beyer,* 953 F. 2d 839, 849 (CA3 1992); *Baker* v. *Lyles,* 904 F. 2d 925, 929 (CA4 1990); *Dzana* v. *Foti,* 829 F. 2d 558, 560–561 (CA5 1987); *Mackey* v. *Dyke,* 29 F. 3d 1086, 1092 (CA6 1994); *Alston* v. *DeBruyn,* 13 F. 3d 1036, 1042–1043 (CA7 1994); *Brown* v. *Frey,* 889 F. 2d 159, 166 (CA8 1989); *Walker* v. *Sumner,* 14 F. 3d 1415, 1419 (CA9 1994); *Reynoldson* v. *Shillinger,* 907 F. 2d 124, 126–127 (CA10 1990); *McQueen* v. *Tabah,* 839 F. 2d 1525, 1528–1529 (CA11 1988); *Lucas* v. *Hodges,* 730 F. 2d 1493, 1504–1506 (CADC 1984). That being so, it is difficult to see why the Court reverses, rather than affirms, the Court of Appeals in this case.

The majority finds that Conner's "discipline in segregated confinement did not present" an "atypical, significant deprivation" because of three special features of his case, taken together. *Ante,* at 486. First, the punishment "mirrored" conditions imposed upon inmates in "administrative segregation and protective custody." *Ibid.* Second, Hawaii's

prison regulations give prison officials broad discretion to impose these other forms of *nonpunitive* segregation. *Ibid.* And, third, the State later "expunged Conner's disciplinary record," thereby erasing any stigma and transforming Conner's segregation for violation of a specific disciplinary rule into the sort of "totally discretionar[y] confinement" that would not have implicated a liberty interest. *Ibid.*

I agree with the first two of the majority's assertions. The conditions in administrative and disciplinary segregation *are* relatively similar in Hawaii. Compare Exh. 60, App. 142–143, 152, with Exh. 61, *id.*, at 156–157, 166. And, the rules governing administrative segregation do, indeed, provide prison officials with broad leeway. See Haw. Admin. Rule § 17–201–22(3) (1983) ("Whenever . . . justifiable reasons exist"). But, I disagree with the majority's assertion about the relevance of the expungement. How can a *later* decision of prison authorities transform Conner's segregation for a violation of a specific disciplinary rule into a term of segregation under the administrative rules? How can a later expungement restore to Conner the liberty that, in fact, he had already lost? Because Conner was found guilty under prison disciplinary rules, and was sentenced to solitary confinement under those rules, the Court should look to *those* rules.

In sum, expungement or no, Conner suffered a deprivation that was significant, not insignificant. And, that deprivation took place under disciplinary rules that, as described in Part II, *supra*, do cabin official discretion sufficiently. I would therefore hold that Conner was deprived of "liberty" within the meaning of the Due Process Clause.

## V

Other related legal principles, applicable here, should further alleviate the majority's fear that application of the Due Process Clause to significant prison disciplinary action, see

Part III, *supra,* will lead federal courts to intervene improperly (as the majority sees it) "in the day-to-day management of prisons, often squandering judicial resources with little offsetting benefit to anyone." *Ante,* at 482. For one thing, the "process" that is "due" in the context of prison discipline is not the full blown procedure that accompanies criminal trials. Rather, "due process" itself is a flexible concept, which, in the context of a prison, must take account of the legitimate needs of prison administration when deciding what procedural elements basic considerations of fairness require. See, *e. g., Goss* v. *Lopez,* 419 U. S., at 578 (the " 'very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation' ") (quoting *Cafeteria & Restaurant Workers* v. *McElroy,* 367 U. S. 886, 895 (1961)); *Mathews* v. *Eldridge,* 424 U. S. 319, 334 (1976) (" '[D]ue process is flexible and calls for such procedural protections as the particular situation demands' ") (quoting *Morrissey* v. *Brewer, supra,* at 481); Friendly, "Some Kind of Hearing," 123 U. Pa. L. Rev. 1267, 1278 (1975) ("required degree of procedural safeguards varies"); *Wolff,* 418 U. S., at 563–567 (requiring—in addition to notice, some kind of hearing, and written reasons for the decision—permission to call witnesses and to present documentary evidence when doing so "will not be unduly hazardous to institutional safety or correctional goals," *id.,* at 566).

More importantly for present purposes, whether or not a particular procedural element *normally* seems appropriate to a certain *kind* of proceeding, the Due Process Clause does not require process unless, in the *individual* case, there is a relevant factual dispute between the parties. Just as courts do not hold hearings when there is no "genuine" and "material" issue of fact in dispute between the parties, see Fed. Rule Civ. Proc. 56 (summary judgment), so the Due Process Clause does not entitle an inmate to additional disciplinary hearing procedure (such as the calling of a witness) unless

there is a factual dispute (relevant to guilt) that the additional procedure might help to resolve, see *Codd* v. *Velger*, 429 U. S. 624, 627 (1977) *(per curiam)*.

I mention this latter legal point both because it illustrates a legal protection against the meritless case, and because a review of the record before us indicates that, in this very case, if we were to affirm, it would pose an important obstacle to Conner's eventual success. The record contains the prison adjustment committee's report, which says that its finding of guilt rests upon Conner's own admissions. The committee wrote that it "based" its "decision" upon Conner's "statements" that (when he was strip-searched) "he turned around" and "looked at" the officer, he "then 'eyed up'" the officer, he "was hesitant to comply" with the strip-search instructions, he "dislikes" the officer, and he spoke an obscenity during the search process. App. to Pet. for Cert. A–67. The record contains no explanation that we have found, either in Conner's affidavits or elsewhere, of how the witnesses he wanted to call (or the other procedures that he sought) could have led to any evidence relevant to the facts at issue.

I note that the petitioner, in her petition for certiorari, asked us, for this reason, to decide this case in her favor. But, we cannot do so. Even were we to assume that this question falls within the scope of the question we agreed to answer, the record nonetheless reveals that the petitioner did not ask for summary judgment on this basis. Thus, Conner has not had an opportunity to point to "specific facts" that might explain why these witnesses (or other procedures) were needed. See Fed. Rule Civ. Proc. 56(e) ("must set forth specific facts showing that there is a genuine issue for trial"). Were this Court to affirm, the defense would remain free to move for summary judgment on remand, and Conner would have to respond with a specific factual showing in order to avoid an adverse judgment.

Because the Court of Appeals remanded this case to the District Court for consideration of these matters, and because, as explained in Parts II–IV, *supra,* I believe it correctly decided that Conner was deprived of liberty within the meaning of the Due Process Clause, I would affirm its judgment.   For these reasons, I respectfully dissent.