In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-1829

DALE MILLER,

*Plaintiff-Appellant*,

*v.*

DIANA DOBIER, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Central District of Illinois.
No. 08-3238—**Harold A. Baker**, *Judge*.

SUBMITTED NOVEMBER 30, 2010—DECIDED FEBRUARY 11, 2011

Before EASTERBROOK, *Chief Judge*, and POSNER and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge*.   Dale Miller is confined at an Illinois state institution, called Rushville, pursuant to the Sexually Violent Persons Commitment Act, 725 ILCS 207/1-99. In this suit under 42 U.S.C. § 1983 against officials of the institution who served on committees that disciplined him, Miller claims that the defendants denied him due process of law by failing to provide

adequate procedural safeguards before disciplining him. The district court granted summary judgment for the defendants.

The suit arises from two unrelated incidents. The first occurred in August 2007, when Miller was cited for threatening a deputy sheriff. After receiving a copy of the incident report, Miller appeared before a disciplinary committee, which found that he had committed a "major" violation of facility rules by making threats and ordered him reduced to "general status" from "intermediate level C." All new residents start in general status and during that time can purchase items from the institution's commissary, attend special events (we are not told what these are) within their residential unit, remain out of their rooms until 10:00 p.m., use the library, exercise room, and recreation yard, have two-hour visits from family members and friends, and borrow a typewriter. After 180 days of good behavior in general status, residents are advanced to intermediate status, which has three levels, beginning with C. Residents in intermediate status C are permitted, in addition to doing what general status permits, to attend special events throughout the institution, remain in their residential unit's day room for late-night special events, borrow electronic equipment (again, we're not told what equipment), receive longer visits, and stay out of their rooms until 10:45 p.m. In addition, because Miller's infraction had been characterized as major, he was required to wear for the next year "black box" handcuffs on all trips outside the institution. The "black box" is a plastic box placed between the hands and over the

apparatus that connects and locks the handcuffs. *Knox v. McGinnis*, 998 F.2d 1405, 1407 (7th Cir. 1993).

Miller's second infraction occurred in July 2008. While temporarily housed in a medical isolation room in the infirmary because he had a contagious skin condition, he allegedly damaged a dresser, used it to try to break a window, and threatened staff. He was immediately placed in "special management" status pending a disciplinary hearing. That status authorizes confining residents in their rooms, a prescribed living area, or "any other area designated by the Program Director." A resident in special management may also be placed in solitary confinement or subjected to involuntary medication, but Miller does not claim to have been subjected to either imposition. A disciplinary committee convened a hearing, which Miller did not attend; he was still medically quarantined because of his skin condition and he had not received a copy of the allegations against him.

The committee sustained the allegations of threats, intimidation, and damage to state property and Miller was then placed in what is called "close" status for 30 days, during which time his curfew was 9:30 p.m. and family visits were limited to an hour and he was denied yard privileges, barred from attending special events, and forbidden use of the library, exercise room, and typewriter.

Miller claims that, just like convicted prisoners accused of disciplinary violations, civilly committed persons are constitutionally entitled to "advance written notice of the charges, the chance to present testi-

mony and documentary evidence to an impartial decisionmaker, and a written explanation, supported by at least 'some evidence' in the record, for any disciplinary action taken." *Lagerstrom v. Kingston*, 463 F.3d 621, 624 (7th Cir. 2006); see *Superintendent, Mass. Correctional Institution v. Hill*, 472 U.S. 445, 454 (1985); *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974); *Piggie v. Cotton*, 344 F.3d 674, 677 (7th Cir. 2003). He submitted evidence that he did not receive these procedural protections, but the evidence is immaterial if the district judge was right in ruling that Miller was entitled to no procedural safeguards because the disciplinary measures to which he was subjected did not deprive him of liberty within the meaning of the due process clause.

Disciplinary measures that do not substantially worsen the conditions of confinement of a lawfully confined person are not actionable under the due process clause, *Sandin v. Connor*, 515 U.S. 472, 485-86 (1995), and this regardless of whether the confinement is criminal or civil. See *West v. Schwebke*, 333 F.3d 745, 748 (7th Cir. 2003); *Thielman v. Leean,* 282 F.3d 478, 484 (7th Cir. 2002); *Leamer v. Fauver*, 288 F.3d 532, 545-46 (3d Cir. 2002). Language in a few cases could be read to suggest that a pretrial detainee or a civil detainee does not have the same rights as prison inmates unless the challenged restriction imposed on him is intended as punishment. See *Rapier v. Harris*, 172 F.3d 999, 1005-06 (7th Cir. 1999); *Baribeau v. City of Minneapolis*, 596 F.3d 465, 483 (8th Cir. 2010) (per curiam); *Fuentes v. Wagner*, 206 F.3d 335, 342 (3d Cir. 2000). But such a reading cannot be correct if it means that a person detained without having been

convicted of a crime can be treated worse than a convicted criminal. What is true is that civil detainees who are more disruptive than prison inmates can be subjected to greater restrictions without those restrictions constituting punishment. But such detainees still have the same right as criminals to complain of a deprivation of liberty without due process of law if the restrictions constitute a deprivation of liberty within the meaning of the Constitution as interpreted by the Supreme Court (with reference we think to all types of detainee) in *Sandin*. The meaning or scope of "liberty" and "property" in the due process clause is not a function of motive—a motive to punish rather than a motive to prevent disorder or other harm that might be caused by someone who could not be punished because he had a sound defense of mental incapacity. Without a deprivation of liberty or property (or life, but that is irrelevant to this case) there is no constitutional duty to provide due process; but if there is such a deprivation the duty attaches regardless of the motive for the deprivation. *Wallace v. Robinson*, 940 F.2d 243, 247-48 (7th Cir. 1991) (en banc).

We did suggest in *Higgs v. Carver*, 286 F.3d 437, 438 (7th Cir. 2002), a distinction between placing a pretrial detainee in segregation "not as punishment but for managerial reasons" that would not require notice and a hearing—for example if the only vacant cell in the jail when the prisoner arrived was in the segregation unit, or the prisoner was considered a suicide risk, or he had to be protected from other prisoners or other prisoners from him; for these were measures that would have to

be taken immediately, without time for notice and a hearing in advance. We did not mean to suggest that once the emergency was past, the jail could nevertheless keep the prisoner in segregation indefinitely without providing the procedural safeguards encapsulated in the term "due process" because it was not "punishing" him, if conditions in the segregation unit were so much more restrictive than those in the rest of the jail as to constitute an actionable incremental deprivation of liberty.

The "if" qualification is critical. Even when Miller was in "close" status, he was free to leave his cell for most of the day, to receive visitors, and in this and other respects to avoid extremes of close confinement such as are encountered in segregation units. It is because intermediate status is so loose that general status or close status seems confining; but the additional restrictions are too limited to amount to a deprivation of constitutional liberty. *Lekas v. Briley*, 405 F.3d 602, 611 (7th Cir. 2005); *Allison v. Snyder*, 332 F.3d 1076, 1079 (7th Cir. 2003).

AFFIRMED.