Julio F. GIANO, Plaintiff,

v.

Glenn GOORD, Commissioner, Department of Correctional Services, Donald Selsky, Director, Special Housing Programs, Frank Irvin, Superintendent, Wende Correctional Facility, Roy Henneberg, Deputy Supt. of Security, Jeffrey Skinner, Captain, Wende Correctional Facility, Walter Shannon, Lieutenant, Wende Correctional Facility, James Burke, Sergeant, Wende Correctional Facility, Timothy Jeziorski, Sergeant, Wende Correctional Facility, Thomas Lamb, Michael Bishop, Gary Keohane, E. McEvoy, Howard Brennan, John Barbera, and John Doe, Correctional Officer, Wende Correctional Facility, Defendants.

No. 97–CV–6238CJS.

United States District Court,
W.D. New York.

June 16, 1998.

Julio F. Giano, Comstock, Pro se.

## DECISION AND ORDER

SIRAGUSA, District Judge.

### INTRODUCTION

Plaintiff Julio Giano, an inmate of Comstock Correctional Facility, has filed this *pro se* action seeking relief under 42 U.S.C. § 1983 (Docket # 1) and has been granted permission to proceed *in forma pauperis* (Docket # 3). Plaintiff was directed by this Court to file proof of exhaustion of his administrative remedies. (Docket # 3). Plaintiff filed his response in a timely manner. (Docket # 5). For the reasons discussed below, certain of plaintiff's claims are dismissed without prejudice pursuant to 42 U.S.C. § 1997e(a) and the remaining claims are dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B).

### PLAINTIFF'S ALLEGATIONS

Plaintiff alleges in his complaint that on June 19, 1995, he was confined at Auburn Correctional Facility ("Auburn"), during which time certain Auburn inmates staged a "peaceful" protest against the decision of the New York Department of Correctional Services ("DOCS") to restructure the housing arrangement of inmates at Auburn. Plaintiff

was not formally accused of any wrongdoing with regard to this incident, but claims that on June 22, 1995, prison officials transferred him from Auburn to a different correctional facility, presumably, Wende Correctional Facility ("Wende"), where the incidents complained of in this action took place.

Plaintiff further alleges that in November 1995, he filed a § 1983 action in this district, entitled *Giano v. Coombe*, docket number 95–CV–6570L, in which he accused various Wende officials of subjecting him to retaliation, under the belief that plaintiff had "singlehandedly created a prison shut-down" at Auburn, and that he had previously complained about the conditions of his confinement at an unidentified facility and date. Plaintiff does not indicate which Wende officials he sued in *Giano v. Coombe* or specify the allegations raised in that action.[1]

According to plaintiff, on September 28, 1996, defendant Timothy Jeziorski, a Wende correctional sergeant, presented a request to defendant Lieutenant Walter Shannon, to obtain and test plaintiff's urine. Defendant Jeziorski allegedly represented to Shannon that the request was based on confidential information he had obtained, indicating plaintiff's use of a controlled substance. Plaintiff claims that, in the thirteen years of his confinement in the DOCS institutions, he had never before been accused of possessing, selling, or using controlled substances. Plaintiff claims that Jeziorski's information was false and misleading. Defendant Shannon approved the request for urinalysis of plaintiff.

Plaintiff alleges that at Wende, inmate urine testing is conducted in the basement of the facility, beneath the disciplinary office in the main corridor that adjoins all housing blocks. There is a general storage room in which urine samples of inmates are kept until they are transported to another location in the prison for testing. He claims that all correctional officers have access to the basement on a 24 hour basis.

On September 30, 1996, defendants John Barbera and Howard Brennan, both correctional officers, escorted plaintiff from his cell to the basement, where defendant Jeziorski ordered plaintiff to submit a urine sample. Plaintiff complied. He claims that after he submitted the sample, neither defendant Barbera nor Brennan placed a tamper-proof seal on the cup that contained his sample. He also claims that he was not informed of the storage or testing locations for his sample. Plaintiff alleges that defendants Barbera and Brennan proceeded to leave plaintiff's urine sample in an unattended, accessible area for approximately two hours.

Furthermore, plaintiff claims that at some point between September 30, 1996 and October 3, 1996,[2] defendants Shannon, Jerziorski, Barbera, and Brennan, along with defendants Thomas Lamb and Michael Bishop, also correctional officers, willfully and deliberately contaminated his urine sample to produce a positive result for use of marijuana. He alleges that the defendants' act were in retaliation for his filing of a lawsuit in *Giano v. Coombe* and for other unspecified grievances that he had filed to complain about conditions of confinement at Wende.

Plaintiff further claims that defendants Bishop and Lamb, again acting in retaliation, filed a false misbehavior report against him, charging him with use of a controlled substance. Following issuance of the misbehavior report, defendant E. McEvoy, who was assigned as an employee assistant to plaintiff in preparing for the disciplinary hearing, allegedly conspired with other unidentified correctional officers to deprive plaintiff of information that would help his defense against the charge, in violation of plaintiff's due process rights. Plaintiff claims that he informed defendant Frank Irvin, the Wende Superin-

---

1. The Court takes judicial notice that in *Giano v. Coombe*, 95–CV–6570L, an action that is still pending in this Court, plaintiff sued numerous officials at Wende, including Frank Irvin and Jeffrey Skinner, who are also named as defendants in this complaint. Plaintiff claimed in that action that he was transferred from Auburn to Wende on June 22, 1995, that once at Wende, he was subjected to a number of unconstitutional conditions of confinement by prison officials, including denial of access to the law library.

2. Although plaintiff refers to the second date as "August 3, 1996," it logically follows from plaintiff's allegations that he meant to state October 3, 1996 as the second date.

tendent, of McEvoy's misconduct, and that Irvin failed to investigate or take action to remedy the alleged misconduct.

At the disciplinary hearing (plaintiff does not specify the date of its occurrence), defendants Jeziorski, Bishop, Lamb, Brennan, Shannon, Barbera, and McEvoy, in further retaliation for plaintiff's prior lawsuit and grievances, deliberately presented either falsified documentary or testimonial evidence to support the controlled substance charge against plaintiff. Plaintiff claims that as a result of the misbehavior charge, he spent 35 days of keeplock, with loss of privileges, but that the charges against him were ultimately dismissed.

Plaintiff claims that after the hearing, defendant McEvoy approached him and threatened to "get even" for having filed reports against McEvoy for his inadequate performance of duties as plaintiff's employee assistant. Defendant McEvoy also stated, "You better be real careful for this is not the end. I work with the officers who test urine and you're not going to make fools of us." Plaintiff also alleges that defendant McEvoy admitted during this conversation that plaintiff had been set up with a contaminated urine sample because of a lawsuit he had filed, but that McEvoy denied any involvement in the set up.

Plaintiff also alleges that from 1986 until the present, he has participated in a family reunion program (FRP) instituted by DOCS, whereby prisoners are allowed to visit with family members in designated trailers outside of the main prison, for a period of up to 72 hours each time. A prerequisite of the FRP is that inmate participants maintain a good institutional record. Additionally, inmates must undergo three different urine tests immediately before and after the trailer visits.

Plaintiff claims that defendants Irvin, Henneberg, Skinner, Jeziorski, Lamb, Bishop, and McEvoy, along with two other correctional officers, defendants Gary Keohane and Sergeant James Burke, knew that plaintiff had a trailer visit on November 18, 1996, and conspired to contaminate one of his urine tests so that he would receive disciplinary sanctions and be suspended from the FRP. Specifically, he alleges that on November 18, 1996,[3] after plaintiff had a trailer visit to see his mother, defendant Keohane ordered him to submit a urine sample in a plastic cup, and then placed the sample in a paper bag, along with the urine sample of another inmate. Defendant Keohane did not secure a tamper-proof seal across the sample container, or inform plaintiff of the storage or testing sites of his samples.

Plaintiff alleges that between November 18 and 20, 1996, defendants Keohane, Lamb, Bishop, and Burke deliberately conspired and contaminated his urine sample to produce a positive result for marijuana use, in order to fabricate a false misbehavior report. He claims that they acted in retaliation for his previous filings of the *Giano v. Coombe* lawsuit and unspecified grievances. Plaintiff claims that at the resulting Tier III disciplinary hearing on December 10, 1996, defendants Keohane, Jeziorski, Bishop, Lamb, McEvoy, Brennan, and Barbera submitted false documentary or testimonial evidence to ensure a guilty finding against plaintiff, and that their actions were in retaliation for the prior lawsuit and grievances. Additionally, plaintiff alleges that defendant Henneberg, who conducted the hearing, deprived him of procedural due process (fair and impartial hearing) by denying him the rights to present material documentary evidence and to call certain witnesses. Plaintiff claims that Henneberg deprived him of these rights after conspiring with defendants Lamb, Bishop, and Keohane, in retaliation for his previous lawsuit and grievances.

Plaintiff was found guilty of the controlled substance charge and sentenced to 30 days of keeplock, loss of phone, commissary, package, and television privileges, a notation in his records that he is considered a drug user, and a one-year suspension from the FRP with subsequent participation contingent upon participation in a drug education program. He claims that defendants Goord, Selsky, and Irvin had full knowledge of the

---

**3.** Plaintiff refers to the date as "October 18, 1996," but it logically follows from his other allegations that he meant to state November 18, 1996 as the date of the incident.

unconstitutional hearing and failed to investigate the matter.

Plaintiff also claims that the urine testing conducted by the defendants on September 30, 1996 violated his Fourth Amendment rights because there was no probable cause for the testing.

Following plaintiff's filing of this action, he was ordered by this Court to submit proof of exhaustion of his administrative remedies. (Docket # 3). Plaintiff filed a response demonstrating that he had appealed the December 10, 1996 disciplinary hearing to the Superintendent, who affirmed the hearing disposition. However, plaintiff's response indicated that he failed to grieve the various incidents of retaliatory conduct by correctional officers, the alleged lack of security in the urine testing procedures, or the lack of probable cause with regard to the two urine tests he underwent. (Docket # 5).

Plaintiff seeks declaratory and injunctive relief, compensatory damages of $10,000 from each defendant, and punitive damages of $100,000.

### DISCUSSION

Plaintiff has met the statutory requirements of 28 U.S.C. § 1915(a) and filed an Authorization with respect to his action. He was previously granted permission to proceed *in forma pauperis.* (Docket # 3).

Section 1915 mandates that when the court grants *in forma pauperis* status, it also must conduct an initial screening of the action to ensure that it goes forward only if it meets certain qualifications. A review of plaintiff's complaint demonstrates that the administrative remedies for plaintiff's claims have not been exhausted. As a result, his claims are subject to dismissal under 42 U.S.C. § 1997e(a).

According to 42 U.S.C. § 1997e(a), "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner ... until such administrative remedies as are available are exhausted."

█ Plaintiff states in his response to this Court's Order requiring proof of exhaustion that he has met the exhaustion requirement for all of his claims by appealing the December 10, 1996 hearing disposition to the Superintendent. (Docket # 5). Specifically, he claims that the retaliation incidents could not be raised in grievances because that would be tantamount to relitigating his defense from the misbehavior hearing, and his only recourse was to appeal the hearing decision. Additionally, plaintiff claims that "resort[ing] to any other avenue of exhaustion would have been an exercise of futility" because he did not believe that the Superintendent would investigate his complaints. Still further, plaintiff claims that because he is complaining in this action about retaliatory conduct that gives rise to due process concerns, these issues could not be addressed through the inmate grievance procedures.

█ However, all matters relating to prison conditions may be grieved, even claims of retaliation and improper drug testing procedures. *See generally* 7 NYCRR Part 701. While it is true that plaintiff's recourse for seeking review of the hearing officer's December 10, 1996 decision (finding him guilty and sentencing him to keeplock and loss of privileges) was to appeal it to the Superintendent, it does not follow that plaintiff was barred from filing grievances against the correctional officers for their numerous alleged acts of retaliation, and that the appeal was his sole recourse for addressing these wrongdoings. In fact, the various acts of retaliation he alleges in this action, including the contamination of his urine samples, the filing of false misbehavior reports, the verbal threats by defendant McEvoy, and the falsification of documentary and testimonial evidence, all should have been grieved through the inmate grievance procedures. Similarly, his complaints about the lack of secure urine testing procedures also should have been grieved before he brought this action.

Although the Court is sympathetic to the serious nature of plaintiff's allegations, the Court finds that his failure to meet the requirements of 42 U.S.C. § 1997e(a) is fatal to his claims. Specifically, his claims of retaliation and of improper urine testing conditions are dismissed without prejudice pursuant to § 1997e(a). Plaintiff may file a new action regarding these matters when he has proper-

ly exhausted his administrative remedies regarding them.

Additionally, a review of plaintiff's complaint demonstrates that plaintiff's remaining claims, regarding the deprivation of procedural due process and the violation of his Fourth Amendment rights, are based on indisputably baseless legal theories. As a result, these claims are subject to dismissal with prejudice under 28 U.S.C. § 1915(e). *Neitzke v. Williams*, 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

Plaintiff brings this action pursuant to 42 U.S.C. § 1983. In order to state a claim under § 1983, a plaintiff must allege: (1) that the challenged conduct was attributable at least in part to a person acting under color of state law; and (2) that such conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Dwares v. City of New York*, 985 F.2d 94, 98 (2d Cir.1993).

### *The Procedural Due Process Claim*

Plaintiff claims that defendant Henneberg, who conducted the December 10, 1996 hearing, deprived him of a fair and impartial hearing by denying his request to present material documentary evidence and to call certain witnesses in his defense. Plaintiff contends that Henneberg's actions deprived him of procedural due process.

The Court need not conduct an analysis of whether the protective procedures afforded to plaintiff at his disciplinary hearing passed constitutional muster "unless 'there exists a liberty or property interest which has been interfered with by the State.'" *Carter v. Carriero*, 905 F.Supp. 99, 103 (W.D.N.Y. 1995) (quoting *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)). According to the Second Circuit:

> Determining whether an inmate has received procedural due process involves a 'two–pronged inquiry: (1) whether the plaintiff had a protected liberty interest in not being confined ... and, if so, (2) whether the deprivation of that liberty interest occurred without due process of law.' *Bedoya v. Coughlin*, 91 F.3d 349, 351–52 (2d Cir.1996).

*Sealey v. Giltner*, 116 F.3d 47, 51–52 (2d Cir.1997). Moreover, in *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Supreme Court held that a prisoner cannot claim a protected liberty interest unless he demonstrates that he was subjected to "atypical and significant hardship[s] ... in relation to the ordinary incidents of prison life." *Id.* at 484, 115 S.Ct. 2293. The Second Circuit has expressed the significance of fact-finding in the determination of whether the discipline imposed was an "atypical and significant hardship." *Sealey*, 116 F.3d at 52. *Sandin* established that a prisoner's liberty interests are implicated only if the discipline he received affected the duration of his sentence in an unexpected manner, or if the punitive confinement involved a "dramatic departure from the basic conditions of the indeterminate sentence." *Sandin*, 515 U.S. at 485, 115 S.Ct. 2293.

■ What must be determined in this case, then, is whether the 30 days of keeplock confinement and lost privileges, and the one-year suspension from the FRP, implicated a liberty interest that entitled him to due process protections. Here, plaintiff claims that as a result of being found guilty of use of a controlled substance, following the December 10, 1996 hearing, he was sentenced to 30 days in keeplock confinement, with loss of phone, commissary, package, and television privileges. Plaintiff was also suspended from the FRP for one year, with reinstatement pending his completion of a drug education program.

■ Keeplock confinement, in and of itself, does not give rise to a liberty interest. *Sullivan v. Schweikhard*, 968 F.Supp. 910, 913 (S.D.N.Y.1997). In New York State prisons, "keeplock" is a form of administrative or disciplinary segregation, in which the inmate is confined to his own cell, deprived of participation in normal prison routine, and denied contact with other inmates. *Gittens v. LeFevre*, 891 F.2d 38, 39 (2d Cir.1989); *see also* 7 NYCRR §§ 301.1–301.7. While package, telephone, and commissary privileges may be suspended, and the inmate is confined to his cell for 23 hours each day, in other respects, the privileges of an inmate in disciplinary

keeplock are not those of prisoners confined in keeplock for administrative detention or protective custody. *McIntosh v. Daddario,* 1998 WL 118156 at *4 (S.D.N.Y. March 17, 1998). Keeplock is considered less confining than is Special Housing Unit confinement. *Id.* Keeplocked inmates may leave their cells for showers, on-site social and legal visits, for example. *Id.* (holding that inmate's disciplinary keeplock confinement for 45 days, with loss of package and phone privileges after inmate was found guilty of violating terms of work release program, did not implicate a liberty interest). They receive the same diet as those in general population, and continue to receive and send mail, as well as obtain materials from the prison library. *Saulter v. Hanslmaier,* 1997 WL 177887, at *2 (S.D.N.Y. April 14, 1997).

The 30–day sentence to keeplock and loss of privileges in this case did not give rise to a liberty interest. There is no indication from the facts that the duration of plaintiff's sentence was affected by the outcome of his disciplinary hearing, or that the terms of his punitive confinement signaled a "dramatic departure" from the basic conditions of his sentence. Plaintiff's term of keeplock was 30 days, and courts have found that longer durations of keeplock confinement, often with a similar loss of privileges, do not implicate liberty interests. *See, e.g., McIntosh,* 1998 WL 118156 at *4–5, (45 days keeplock plus loss of privileges); *Reaves v. Williams,* 1997 WL 10132 at *5 (S.D.N.Y. January 10, 1997) (69 days served in keeplock, of a 90–day sentence). Plaintiff, moreover, remained in his regular cell during the keeplock period. *See Saulter,* 1997 WL 177887, at *2 (taking into account fact that keeplock inmates were housed in cells identical to those used in general population).

 Additionally, the Court finds that plaintiff's liberty interests were not implicated by the suspension of his FRP (family reunion program) visits. It is well-established that contact visits are a privilege for inmates, not a right. *See Block v. Rutherford,* 468 U.S. 576, 589, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984); *Gatson v. Selsky,* 1997 WL 159258, at *3 (N.D.N.Y. April 4, 1997) (inmate's loss of FRP visits does not give rise to liberty interest). It is entirely within the discretion of the prison officials as to whether to permit conjugal visits or restrict regular visitation. *Gatson,* 1997 WL 159258, at *3; *Henry v. Coughlin,* 940 F.Supp. 639, 643–44 (S.D.N.Y.1996) (finding no liberty interest where plaintiff's regular visitation rights were suspended on days when he had FRP visits.) Plaintiff's procedural due process claim is accordingly dismissed with prejudice.[4]

### *The Fourth Amendment Claim*

Plaintiff claims that defendants Goord, Irvin, Shannon, and Jeziorski violated his Fourth Amendment rights to be free from unreasonable searches, because they lacked probable cause to require him to submit to the urine tests on September 30, 1996. This claim is meritless and must be dismissed.

 A prisoner's privacy rights are considerably diminished once he is incarcerated. *Bell v. Wolfish,* 441 U.S. 520, 557, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Moreover, "[i]f the intrusion into one's privacy is found to be minimal, ... and the expectation of privacy is minimal ... and there is a governmental reason advanced supporting a search, ... then the search will not violate one's Fourth Amendment rights." *Harris v. Keane,* 962 F.Supp. 397, 407 (S.D.N.Y.1997) (holding that urinalysis testing of inmate did not violate his privacy rights where probable cause to search, based on correctional officer's detection of marijuana odor, existed). The New York State regulations provide that corrections personnel may require an inmate to submit a urine test based on reasonable suspicion and based on information from a source that the inmate is or has recently

---

4. In light of the dismissal of the procedural due process claim, plaintiff's claims against defendants Goord, Selsky, and Irvin for failure to investigate his complaints of an unfair hearing are also dismissed. *See Wright v. Santoro,* 714 F.Supp. 665, 668 (S.D.N.Y.) (holding that dismissal of complaint against the defendant who was alleged to have committed the constitutional violation mooted the allegations that other defendants condoned his actions), *aff'd,* 891 F.2d 278 (1989).

used illicit drugs or alcohol. 7 NYCRR § 1020.4(a)(1)(iii).

 In this case, plaintiff alleges that defendant Jeziorski requested approval from defendant Shannon to test plaintiff's urine, based on information from a confidential informant that plaintiff had recently used a controlled substance. Plaintiff characterizes the information cited by Jeziorski was "false and misleading," but it appears from his allegations that defendant Jeziorski did present defendant Shannon with evidence, consistent with the regulations (i.e., information from a source about plaintiff's use of a controlled substance), that there was probable cause to order the test. Moreover, it cannot be said that the urine test was anything but a minimal intrusion into plaintiff's privacy. *See Harris,* 962 F.Supp. at 407 n. 14 ("[U]rinalysis is a commonplace, noninvasive test that is frequently performed [in prisons]."). Accordingly, plaintiff's Fourth Amendment claim is dismissed with prejudice.

### CONCLUSION

For the reasons discussed above, plaintiff's claims regarding retaliatory conduct and the urine testing procedures are dismissed without prejudice pursuant to 42 U.S.C. § 1997e(a), and the remaining claims are dismissed with prejudice pursuant to 28 U.S.C. § 1915(e). Plaintiff is forewarned that his right to pursue further relief in federal court at public expense will be greatly curtailed if he has three actions or appeals dismissed under the provisions of 28 U.S.C. § 1915(e). *See* 28 U.S.C. § 1915(g).

I hereby certify that any appeal from this Order would not be taken in good faith pursuant to 28 U.S.C. § 1915(a), and leave to appeal to the Court of Appeals as a poor person is hereby denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

### ORDER

IT HEREBY IS ORDERED, that plaintiff's claims regarding retaliatory conduct and the urine testing procedures are dismissed without prejudice pursuant to 42 U.S.C. § 1997e(a);

FURTHER, that the remaining claims are dismissed with prejudice pursuant to 28 U.S.C. § 1915(e);

FURTHER, that leave to appeal to the Court of Appeals as a poor person is denied.

SO ORDERED.