Anthony R. VARDA, Plaintiff-Appellant,†

v.

GENERAL MOTORS CORPORATION, Defendant-Respondent.

Court of Appeals

*No. 00–1720. Submitted on briefs December 13, 2000.—Decided March 15, 2001.*

2001 WI App 89

(Also reported in 626 N.W.2d 346.)

†Petition to review denied.

756

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Anthony R. Varda* of *DeWitt Ross & Stevens S.C.*, Madison.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Kim M. Schmid, C. Paul Carver* and *Jennifer K. Huelskoetter* of *Bowman and Brooke LLP*, Minneapolis, Minnesota.

Before Dykman, P.J., Vergeront and Deininger, JJ.

¶ 1. VERGERONT, J. Anthony Varda appeals a trial court order dismissing his complaint for relief under Wisconsin's "Lemon Law," WIS. STAT. § 218.0171 (1999–2000).[1] According to the complaint, Varda leased a new vehicle that met the requirements of a "lemon" within the first year of the lease term, but he

---

[1] The relevant statutory sections were renumbered by 1999 Act 31, § 287, but no substantive changes were made. All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

did not demand relief under the statute from the manufacturer until after the lease term expired and he had purchased the vehicle under the terms of the lease. We conclude that at the time Varda made the demand, he was not a lessee within the meaning of § 218.0171(1)(b)4 and did not meet any other definition for consumer under para. (1)(b). We therefore conclude the complaint did not state a claim for relief. We also conclude the motion to dismiss the complaint was properly served under WIS. STAT. § 801.14(2) by means of Federal Express. Accordingly, we affirm.

## BACKGROUND

¶ 2.  The complaint, filed on November 16, 1999, alleges as follows. On December 11, 1995, Varda entered into a two-year lease with North Shore Bank for a 1996 Chevrolet Blazer purchased by the bank from Jon Lancaster Chevrolet of Madison, Wisconsin. Varda took possession of the vehicle on that same day. Over the next ten months Varda experienced a problem with the vehicle's rear tailgate window opening on its own, and, after four unsuccessful attempts to correct this problem, Jon Lancaster finally corrected it on October 1, 1996. Beginning in April 1996, Varda experienced repeated problems with the brakes and brought the vehicle to Jon Lancaster for brake service four times before the end of the lease term, at which time Varda purchased the vehicle pursuant to the terms of the lease. Immediately after purchase of the vehicle, Varda attempted to sell it because of his dissatisfaction over the brakes, but he received no offer. He continued to have problems with the brakes during 1998 and 1999, taking it to the dealer for brake service three more times, and unsuccessfully attempting to sell it again in 1998. The problem with the rear tailgate win-

dow and the brakes were nonconformities under the warranty.

¶ 3. On August 26, 1999, Varda demanded relief under the Lemon Law by serving a demand on General Motors Corporation that it repurchase the vehicle. This followed the announcement in July 1999 of a recall of 1991 through 1996 Blazers for the brake problem Varda had experienced. After General Motors failed to repurchase the vehicle, Varda requested arbitration from the Better Business Bureau, but he was not successful in obtaining either a repurchase or a refund. After the arbitration decision and before filing the complaint in this action, Varda traded the vehicle.

¶ 4. In his complaint Varda sought refund of the lease payments, lease purchase price, sales tax, license and title fees, repair expenses, and interest paid on financing in the total amount of $34,430.40; and he asked for double those damages as well as attorney fees and costs under WIS. STAT. § 218.0171(7).

¶ 5. General Motors moved to dismiss the complaint, contending it did not state a claim for relief under the Lemon Law for several reasons. Varda moved to strike that motion on the ground, among others, that (1) it had not been served as required by WIS. STAT. § 801.14(2) because Federal Express is not mail, and (2) delivery to a law firm's receptionist does not comply with the statute.

¶ 6. The trial court concluded the motion to dismiss was properly served because WIS. STAT. § 801.14(2) provides for service by "delivery" as well as by "mail," Federal Express is a form of "delivery," and the package containing the pleadings was left in a conspicuous place in Varda's office. On the merits of the motion to dismiss, the court concluded that when Varda purchased the vehicle at the end of the lease

term, he no longer met any definition of "consumer" under WIS. STAT. § 218.0171(1)(b), and he therefore did not meet the requirement that he be a consumer when he made the demand on General Motors.[2] The court therefore dismissed the complaint.

## DISCUSSION

¶ 7.    Varda contends the trial court erred in concluding that service was proper under WIS. STAT. § 801.14(2) and erred in its interpretation of the Lemon Law. Resolution of both issues involves the application of a statute to a given set of facts. The facts relevant to the service issue are set forth in the affidavits in support of and in opposition to Varda's motion to strike and are not disputed. Therefore, the construction of the statute and its application to those facts is a question of law, which we review de novo. *State v. Isaac J.R.*, 220 Wis. 2d 251, 255, 582 N.W.2d 476 (Ct. App. 1998). The facts relevant to the interpretation and application of the Lemon Law are those alleged in the complaint, which, for purposes of deciding a motion to dismiss, we take as true. *Irby v. Macht*, 184 Wis. 2d 831, 836, 522 N.W.2d 9 (1994), *overruled on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995). Whether the facts alleged in the complaint state a claim for relief under a statute also presents a question of law subject to our de

---

[2] Because of its disposition on this issue, the court found it unnecessary to address whether a consumer could maintain a claim under the Lemon Law when the consumer had disposed of a vehicle after an unsuccessful demand upon a manufacturer and before filing a lawsuit. The court also did not address GM's argument that laches barred the action. Although the parties brief both these issues on appeal, it is unnecessary for this court to address them.

novo review. *See id.* Despite our de novo standard of review, we benefit from the trial court's thorough analysis.

¶ 8.   In construing a statute, our aim is to ascertain the intent of the legislature, and our first resort is to the language of the statute itself. *Isaac J.R.*, 220 Wis. 2d at 255. If the words of the statute convey the legislative intent, that ends our inquiry; we do not look beyond the plain language of a statute to search for other meanings, but simply apply the language to the facts before us. *Id.* at 255–56. However, if the language of the statute is ambiguous or unclear, we examine the scope, history, context, subject matter, and the object of the statute in order to ascertain the intent of the legislature. *Id.* at 256. A statute is ambiguous when it is capable of being understood by reasonably well-informed persons in two or more different senses. *Id.* Whether a statute is ambiguous is a question of law. *Awve v. Physicians Ins. Co.*, 181 Wis. 2d 815, 822, 512 N.W.2d 216 (Ct. App. 1994).

*Service under* WIS. STAT. § 801.14(2)

¶ 9.   WISCONSIN STAT. § 801.14(2) provides:

Service upon the attorney or upon a party shall be made by delivering a copy or by mailing it to the last-known address, or, if no address is known, by leaving it with the clerk of the court. Delivery of a copy within this section means: handing it to the attorney or to the party; transmitting a copy of the paper by facsimile machine to his or her office; or leaving it at his or her office with a clerk or other person in charge thereof; or, if there is no one in

charge, leaving it in a conspicuous place therein. . . .
Service by mail is complete upon mailing.

¶ 10. In the affidavit submitted by General Motors, Kimberly Carlson avers that she is an attorney representing General Motors and on December 31, 1999, she placed a copy of the motion to dismiss in a Federal Express envelope addressed to Varda in his capacity as attorney representing himself through the law offices of DeWitt, Ross & Stevens and deposited the envelope at the Federal Express Minneapolis/St. Paul Airport location. The attached Federal Express receipt shows the envelope was delivered to the address of DeWitt, Ross & Stevens on January 3, 2000, at 9:10 a.m. and signed for by "M. Croft." Carlson avers that she subsequently spoke by telephone to a person at the DeWitt, Ross & Stevens law firm who identified herself as Ms. Croft and who, in response to the question of what her position in the firm was, stated that "for Federal Express she was a receptionist."

¶ 11. In Varda's affidavit he avers he is an employee of DeWitt, Ross & Stevens, acting as attorney in this case. When Federal Express is delivered to the firm's office, it is received by the receptionist and distributed internally through an internal mail system, then left in a basket for the recipient. Varda further avers: "The firm's receptionist is not a person in charge of the office and is not authorized to accept service of process; standing policy is for the Office Manager or Managing Partner to accept service of process unless the process is directed to a specific firm attorney who is present to accept such process." In his brief to the trial court Varda asserted that on January 3, 2000, Marina Croft was a receptionist, but was never authorized to receive service nor was she ever in charge of the office.

¶ 12. Varda agrees with the trial court's ruling that Federal Express is not "mail" within the meaning of the statute, but disputes its conclusion that, considering Federal Express to be a form of delivery, the package was left "at his office with a clerk or other person in charge thereof; or, if there is no one in charge, leaving it in a conspicuous place therein." In response, General Motors contends the court erred in concluding Federal Express is not "mail," but, in the alternative, it agrees with the trial court that the requirements under the statute for delivery were met.

¶ 13. There is no Wisconsin case discussing whether Federal Express is "mail" within the meaning of this statute, and it appears there is a split of authority in the federal courts on whether Federal Express constitutes "mail" within the meaning of the counterpart federal rule, FED. R. CIV. P. 5(b). *Cf. Magnuson v. Video Yesteryear*, 85 F.3d 1424, 1431 (9th Cir. 1996) (Federal Express is not "mail"), *with U.S. v. 63–29 Trimble Road*, 812 F. Supp. 332, 334 (E.D.N.Y. 1992) (Federal Express is "mail"). We do not decide this issue, however, because we conclude that service of the motion to dismiss was made by "delivering a copy" to "a clerk or other person in charge" of Varda's office.

¶ 14. The parties do not dispute that Federal Express is a form of delivery. The disagreement focuses on whether the receptionist who signed and accepted the material delivered is a "clerk or other person in charge [of the office]." Varda argues she is not, because, as a receptionist, she is not in charge of the office and, under firm policy, she is not "authorized to accept service of process," only the office manager or managing partner are so authorized.

¶ 15. Varda relies on the line of cases that discuss service requirements for commencement of an

action, *see, e.g., American Family Mut. Ins. Co. v. Royal Ins. Co.*, 167 Wis. 2d 524, 533, 481 N.W.2d 629 (1992), and *Dietrich v. Elliott*, 190 Wis. 2d 817, 826, 528 N.W.2d 17 (Ct. App. 1995), and he refers in his argument to "service of process." "Service of process" is the means by which a lawsuit is instituted, *Accounting Data, Inc. v. McMurtrie*, 78 Wis. 2d 89, 92, 253 N.W.2d 534 (1977), and it is designed to attain personal jurisdiction over the person of the defendant. *Bendimez v. Neidermire*, 222 Wis. 2d 356, 364, 588 N.W.2d 55 (Ct. App. 1998). The rule of strict compliance with the rules of statutory service applies when the rule in question provides for service that confers jurisdiction over the person. *Dietrich*, 190 Wis. 2d at 827.[3]

¶ 16.    However, in this case we are not concerned with service of a summons and complaint under WIS. STAT. §§ 801.02, 801.10 and 801.11, but, rather, with service of pleadings and other documents once an action has been instituted by service of a summons and complaint and the court already has jurisdiction over the person or the defendant. We therefore do not begin with reference to cases that address the requirements for service of a summons and complaint, as Varda

---

[3] Varda argues that the trial court erroneously placed the burden on him to prove lack of compliance with the service requirements of WIS. STAT. § 801.14(2) rather than placing the burden on General Motors to show compliance. The cases he relies on address the requirements of service of a summons and complaint, which is necessary to obtain jurisdiction over a person. *See American Family Mut. Ins. Co. v. Royal Ins. Co. of America*, 167 Wis. 2d 524, 533, 481 N.W.2d 629 (1992); *Dietrich v. Elliot*, 190 Wis. 2d 817, 827, 528 N.W.2d 17 (Ct. App. 1995). Whether Varda or General Motors has the burden of proving compliance with § 801.14(2) does not affect our analysis or our conclusion in this case; therefore we do not decide this issue.

urges, but, instead, begin with the language of WIS. STAT. § 801.14(2), and, in particular, the phrase "person in charge [of the office]."

¶ 17.  We are uncertain whether Varda is arguing that only persons who are authorized by office policy to accept service of process are persons in charge of the office and we therefore address this possible construction. As we have already explained, "service of process" as used in the case law refers to the service of a summons and complaint. We conclude it is unreasonable to construe "person in charge [of the office]" as describing only those persons who are authorized by office policy to accept service of process, because WIS. STAT. § 801.14(2) is not concerned with service of a summons and complaint, and nothing in the language of the statute suggests that the meaning of the disputed phrase should be limited in this way.

¶ 18.  We understand that Varda's primary argument is that "person in charge [of the office]" means a person who is in charge of the management of the law firm—such as the office manager or managing partner. We conclude that this is a reasonable construction, as is the one General Motors proposes: that, when an office designates a person to receive and sign for Federal Express deliveries, that is a "person in charge [of the office]" within the meaning of WIS. STAT. § 801.14(2).

¶ 19.  We therefore consider the purpose of the statute, bearing in mind that in interpreting a statute prescribing how service is to be made, we are to focus on the purpose of the statute and the type of action to which the statute relates. *Kruse v. Miller Brewing Co.*, 89 Wis. 2d 522, 528, 279 N.W.2d 198 (1979). It is evi-

dent from the terms of WIS. STAT. § 801.14(1) and (2) that the purpose of subsec. (2) is to provide notice to a litigant of orders entered by the court so that the litigant is apprised of court action and can comply with court orders, and to provide notice of the pleadings and other documents filed by the adverse party so that the litigant is apprised of those and may timely respond.

¶ 20.  In keeping with the fact that WIS. STAT. § 801.14 does not have as a purpose establishing jurisdiction over the person, service by mail is routinely permitted under this statute, in contrast to WIS. STAT. § 801.11(1)(c) and (5)(b), which permit service by mail only if personal service is not possible with reasonable diligence and then only in connection with publication. Delivery in § 801.14(2) is an alternative to service by mail, and, although delivery may be to the party or attorney personally, that is not required: one may choose to deliver by leaving the material "in a conspicuous place in the office" if "there is no one in charge." These alternatives for delivery—at the delivering party's option, without requiring any "reasonable diligence" in first attempting delivery to the party or attorney himself or herself, and without even requiring delivery to a person at all (if no one is in charge)—are in marked contrast to the strict hierarchy established and the specific requirements imposed under § 801.11.

¶ 21.  We also observe that the use of the term "clerk" before "or *other* person in charge [of the office]" (emphasis added) indicates that a clerk is considered an employee who is in charge of the office. Since "clerk" is commonly used to mean someone employed to perform routine tasks in an office and not the manager of the entire office or enterprise,[4] it seems unlikely the

---

[4] THE AMERICAN HERITAGE COLLEGE DICTIONARY (3d ed. 1993) at 261 defines clerk as "a person who works in an office handling

legislature intended that "or other person in charge [of the office]" could include only persons responsible for managing the entire office or enterprise.

¶ 22. Moreover, the alternative of leaving the material in a conspicuous place is more consistent with interpreting "person in charge [of the office]" to include rather than exclude a receptionist. Under Varda's interpretation, the person delivering the material must (if delivery is not to the individual party or attorney personally) give it to the managing partner or office manager because they are in charge of the law firm, but, if they are not present, then the delivery person may simply leave the material in a conspicuous place. However, the material is more likely to get to the intended recipient if it is left with a receptionist or other person employed in the office than if it is simply left "in a conspicuous place."

¶ 23. We conclude it is more reasonable to construe "person in charge [of the office]" to include a receptionist or other firm employee whose responsibilities include signing for Federal Express deliveries than it is to adopt the more restrictive meaning proposed by Varda. A person with this responsibility will see that the intended recipient receives the delivery, and, thus, the purpose of the statute is accomplished. It is not necessary to require that delivery be to a person with more authority in the firm in order to achieve the purpose of the statute; such a requirement is not consistent with the other alternatives for service in the statute; and it unnecessarily imports the stricter

such things as records, correspondence, or files." We may consult a dictionary to establish the meaning of common words. *Swatek v. County of Dane*, 192 Wis. 2d 47, 61, 531 N.W.2d 45 (1995).

requirements for service of process when there is no indication in the language of the statute that the legislature intended that.

■

¶ 24.   Construing the statute in this manner, we conclude Croft was a "person in charge [of the office]" within the meaning of WIS. STAT. § 801.14(2), and that the method of service therefore met the requirements of this statute. There is no dispute that if service by the Federal Express delivery on January 3, 2000, was proper, the motion to dismiss was timely filed. Accordingly, the trial court properly denied Varda's motion to strike the motion to dismiss.

*Lemon Law*

¶ 25.   Wisconsin's Lemon Law provides:

> If a new motor vehicle does not conform to an applicable express warranty and the consumer reports the nonconformity to the manufacturer, the motor vehicle lessor or any of the manufacturer's authorized motor vehicle dealers and makes the motor vehicle available for repair before the expiration of the warranty or one year after first delivery of the motor vehicle to a consumer, whichever is sooner, the nonconformity shall be repaired.

WIS. STAT. § 218.0171(2)(a). If "after a reasonable attempt to repair," the nonconformity is not repaired,[5]

---

[5] "Reasonable attempt to repair" means any of the following occurring within the term of an express warranty applicable to a new motor vehicle or within one year after first delivery of the motor vehicle to a consumer, whichever is sooner:

1. The same nonconformity with the warranty is subject to repair by the manufacturer, motor vehicle lessor or any of the manufacturer's authorized motor vehicle dealers at least 4 times and the nonconformity continues.

the manufacturer must take certain specified steps, depending on which definition of "consumer" is applicable.

¶ 26. With respect to the consumers described in WIS. STAT. § 218.0171(1)(b)1–3 (purchasers, certain non-resale transferees, and persons who may enforce the warranty),[6] the manufacturer must, at the direction of the consumer, either accept return of the vehicle and replace it with a comparable new motor vehicle and refund any collateral costs, or accept return of the vehicle and refund to the consumer (and to any holder of a perfected security interest as their interest may appear) the full purchase price, sales tax, finance charge, amount paid by consumer at point of sale, and collateral costs, less a reasonable allowance for use. Section 218.0171(2)(b)2.a and b.

> 2. The motor vehicle is out of service for an aggregate of at least 30 days because of warranty nonconformities.

WIS. STAT. § 218.0171(1)(h).

> "Nonconformity" means a condition or defect which substantially impairs the use, value or safety of a motor vehicle, and is covered by an express warranty applicable to the motor vehicle or to a component of the motor vehicle, but does not include a condition or defect which is the result of abuse, neglect or unauthorized modification or alteration of the motor vehicle by a consumer.

WIS. STAT. § 218.0171(1)(f).

[6] WISCONSIN STAT. § 218.0171(1)(b) defines consumers as any of the following:

> 1. The purchaser of a new motor vehicle, if the motor vehicle was purchased from a motor vehicle dealer for purposes other than resale.
> 2. A person to whom the motor vehicle is transferred for purposes other than resale, if the transfer occurs before the expiration of an express warranty applicable to the motor vehicle.
> 3. A person who may enforce the warranty.
> 4. A person who leases a motor vehicle from a motor vehicle lessor under a written lease.

¶ 27. The manufacturer's obligations to a consumer described in WIS. STAT. § 218.0171(1)(b)4, that is, a person "who leases a motor vehicle from a motor vehicle lessor under a written lease," are set out in a separate subdivision:

> 3. a. With respect to a consumer described in sub. (1)(b)4, [the manufacturer must] accept return of the motor vehicle, refund to the motor vehicle lessor and to any holder of a perfected security interest in the motor vehicle, as their interests may appear, the current value of the written lease and refund to the consumer the amount the consumer paid under the written lease plus any sales tax and collateral costs, less a reasonable allowance for use.[7]
>
> b. Under this subdivision, the current value of the written lease equals the total amount for which that lease obligates the consumer during the period of the lease remaining after its early termination, plus the motor vehicle dealer's early termination costs and the value of the motor vehicle at the lease expiration date if the lease sets forth that value, less the motor vehicle lessor's early termination savings.

WIS. STAT. § 218.0171(2)(b)3.a–c (footnote added).

---

[7] WISCONSIN STAT. § 218.0171(2)(b)3.c provides for the computation of a reasonable allowance for use:

> Under this subdivision, a reasonable allowance for use may not exceed the amount obtained by multiplying the total amount for which the written lease obligates the consumer by a fraction, the denominator of which is 100,000 and the numerator of which is the number of miles the consumer drove the motor vehicle before first reporting the nonconformity to the manufacturer, motor vehicle lessor or motor vehicle dealer.

¶ 28. WISCONSIN STAT. § 218.0171(2)(cm) provides further specificity regarding how a consumer as described in subd. (1)(b)4 obtains a refund under subd. (2)(b)3. The consumer must offer to return the vehicle to the manufacturer; no later than thirty days after that offer, the manufacturer must give the refund to the consumer; when the manufacturer does that, the consumer must return the vehicle. Section 218.0171(2)(cm)1. Under subd. (2)(cm)2, the vehicle lessor must offer to and ultimately transfer to the manufacturer title to the vehicle.

¶ 29. Varda contends that, because he was a "consumer" as defined in WIS. STAT. § 218.0171(1)(b)4 when his right to relief accrued during the first year of his lease term, he was still a consumer under that definition when he made the demand upon General Motors. Under his reading of subd. (1)(b)4, there is no time requirement on when he had to make his demand for relief under subd. (2)(b)3. General Motors counters that because Varda was not leasing the vehicle when he made the demand for relief from General Motors, he was not a consumer under subd. (1)(b)4.

¶ 30. We agree with Varda that WIS. STAT. § 218.0171(1)(b)4 does not indicate at what point in time one must be a lessee as defined in this subparagraph in order to be a "consumer" for purposes of obtaining relief under § 218.0171. However, in order to arrive at the legislature's intent on this point, we do not construe this subparagraph in isolation, but examine it in light of the entire statute. *State v. Swatek*, 178 Wis. 2d 1, 6, 502 N.W.2d 909 (Ct. App. 1993). When we consider the subdivisions specifying the relief available for consumers as defined in subd. (1)(b)4, we are convinced that the only reasonable construction is that a person who purchases a vehicle under the terms of a

lease at the expiration of a lease term is no longer a consumer within the meaning of subd. (1)(b)4.

¶ 31.  The manufacturer's obligation when a consumer, as described in WIS. STAT. § 218.0171(1)(b)4, makes a demand are: acceptance of the return of the motor vehicle, refund to the lessor of the current value of the written lease, and refund to the consumer of the amount the consumer paid under the written lease plus any sales tax or collateral costs, less a reasonable use allowance. Subparagraph (2)(b)3.a. These are not presented as alternatives, indicating that the legislature intended that a manufacturer take all three steps when a consumer as defined in subd. (1)(b)4 demands relief for a "lemon." However, if the lease term has expired and the vehicle has been purchased under the terms of the lease, the provisions for return of the vehicle and transfer of title to the manufacturer, as described in para. (2)(cm), have no applicability: it is the former lessee, not the former lessor, who now has title of the motor vehicle. Similarly, if the term of the lease has expired at the time this demand for relief is made, there is no current value to the written lease, and the formula specified in subp. 3.b for computing the current value of the lease has no applicability. Finally, subd. (2)(cm)3 provides that "no person may enforce the lease against the consumer after the consumer receives a refund due under par. (b)3." This also has no applicability if the lease term has expired. In short, the language describing two of the components of relief available when a consumer is a lessee as described in subd. (1)(b)4 is inapplicable once a person has purchased the vehicle at the expiration of the lease term.

¶ 32.  We do not view the component of relief that the manufacturer accept the return of the vehicle as

simply an option which a consumer, as described in WIS. STAT. § 218.0171(1)(b)4, may or may not decide to take advantage of. The provisions in subd. (2)(b)2 setting forth the two alternative forms of relief available to all other categories of consumers also contemplate that the consumer will return the vehicle.[8] This is logical because, in all cases, the vehicle has a nonconformity that has not been repaired after reasonable attempts at repair. Given the detail the legislature has provided on the available relief and the uniformity of the return of the vehicle as a feature of every category of relief, it is not logical the legislature intended that a lessee who was entitled to relief under subd. (2)(b)3 during the lease term could decide not to invoke that relief, purchase the vehicle under the terms of the lease at the expiration of the lease term, and then later invoke relief under subd. (2)(b)3.

¶ 33. Varda contends that all the relief he seeks in his complaint as the purchaser of the vehicle is available under WIS. STAT. § 218.0171(2)(b)3—refund of the

---

[8] WISCONSIN STAT. § 218.0171(2)(b)2 provides:

2. At the direction of a consumer described under sub. (1) (b)1., 2. or 3., do one of the following:

a. Accept return of the motor vehicle and replace the motor vehicle with a comparable new motor vehicle and refund any collateral costs.

b. Accept return of the motor vehicle and refund to the consumer and to any holder of a perfected security interest in the consumer's motor vehicle, as their interest may appear, the full purchase price plus any sales tax, finance charge, amount paid by the consumer at the point of sale and collateral costs, less a reasonable allowance for use. Under this subdivision, a reasonable allowance for use may not exceed the amount obtained by multiplying the full purchase price of the motor vehicle by a fraction, the denominator of which is 100,000 or, for a motorcycle, 20,000, and the numerator of which is the number of miles the motor vehicle was driven before the consumer first reported the nonconformity to the motor vehicle dealer.

purchase price, refund of license and title fees, and refund of interest paid on financing.[9] According to Varda, these expenses are included in the term "the amount the consumer paid under the written lease." Subparagraph (2)(b)3.a.[10] The inclusion of these items of relief in this subdivision, he asserts, shows that the legislature intended that persons who purchased the vehicle at the end of the lease term are consumers entitled to relief under this subdivision.

¶ 34. We do not agree with Varda that all the relief he seeks as a purchaser of the vehicle is provided for in subd. (2)(b)3. When subd. (2)(b)3 is read in conjunction with subp. (2)(b)2.b, which provides the alternative of a refund for persons who are consumers under the other definitions in para. (1)(b), it is evident the legislature knew how to specify the expenses incurred by the purchaser of a "lemon": the refund for this group of consumers expressly includes the "purchase price . . . finance charge, amount paid by consumer at point of sale," in addition to collateral costs and sales tax. Subparagraph (2)(b)2.b. This is another indication the legislature did not intend to include under subd. (1)(b)4 former lessees who purchased the vehicle under the lease at the expiration of the lease term.

¶ 35. Varda points to the legislative history of WIS. STAT. § 218.0171(1)(b)4, (2)(b)3, and (2)(cm), arguing that when the legislature added protection for

---

[9] According to the complaint, the demand Varda made on General Motors was for "repurchase of the vehicle."

[10] These expenses are not included in the definition of "collateral costs," which are defined as "expenses incurred by a consumer in connection with the repair of a nonconformity, including the costs of obtaining alternative transportation." WIS. STAT. § 218.0171(1)(a).

lessees to the existing protection for owners, it intended that lessees be treated in the same manner as owners. He relies on this statement in the Legislative Reference Bureau (LRB) analysis: "This bill extends the remedies under the 'Lemon Law' to a person who leases a motor vehicle under a written lease."[11] However, resort to legislative history is not appropriate when there is no ambiguity to resolve. *State v. Setagord*, 211 Wis. 2d 397, 406, 565 N.W.2d 506 (1997). But even if we do consider this LRB analysis, it adds nothing to our discussion. The quoted statement is followed by a summary of the proposed legislation, contrasting the proposed legislation with the then existing remedies for owners and persons who may enforce warranties. It is evident from the summary, just as it is evident from reading the plain language of the statute, that the relief available for consumers as described in subd. (1)(b)4 and the relief available for persons meeting all other definitions of consumers are not identical.

¶ 36. Varda emphasizes that the Lemon Law is a remedial statute and we are therefore to construe it liberally "to suppress the mischief and advance the remedy that the statute intended to afford." *Hughes v. Chrysler Motors Corp.*, 197 Wis. 2d 973, 979, 542 N.W.2d 148 (1996). However, we do not apply this principle to fashion a remedy that is inconsistent with the plain language of the statute. Moreover, we do not agree with Varda that it is necessary to provide the relief he seeks in order to achieve the purposes of the Lemon Law.

---

[11] Analysis accompanying 1987 AB 188, enacted as 1987 Wis. Act 105.

¶ 37. Those purposes were recently described in *Dieter v. Chrysler Corp.*, 2000 WI 45, 234 Wis. 2d 670, 684, 610 N.W.2d 832:

> The lemon law was enacted to provide consumers with remedies beyond the "inadequate, uncertain and expensive remedies of the Uniform Commercial Code or the Magnuson-Moss Warranty Act." It is a warranty enforcement statute, "a self-enforcing consumer law that provides 'important rights to motor vehicle owners." . . . The intent behind the law was to 'improve auto manufacturers' quality control . . . [and] reduce the inconvenience, the expense, the frustration, the fear and [the] emotional trauma that lemon owners endure.' " The law also was designed to provide an incentive to a manufacturer to restore a purchaser of a "lemon" to the position he was in at the time of the purchase. ( Citations omitted.)

¶ 38. Allowing a person who is entitled to relief under WIS. STAT. § 218.0171(2)(b)3 to wait until the lease term expires, purchase the vehicle, and then some time later invoke relief as a lessee does not make remedies for the "lemon" the person leased less expensive, less uncertain, more convenient, or more prompt. It does not improve manufacturers' quality control. It does not provide an incentive to manufacturers to restore the person who leased a "lemon" to the position he or she was at the time of entering into the lease. Rather, these purposes are better served by requiring that a person who is entitled to relief under subd. (2)(b)3 demand that relief from the manufacturer before the expiration of the lease term, rather than purchasing the vehicle at the expiration of the lease term and demanding relief under subd. (2)(b)3 at a later time.

¶ 39.   Varda also contends we must adopt his proposed construction in order to avoid unreasonable or absurd results. He contends it is unreasonable that a person with a shorter lease term has less time within which to demand relief from the manufacturer than a person with a longer lease term.[12] We do not agree. Whatever the lease term, it is rational to require a person who knows that the vehicle he or she has leased has a nonconformity that has not been able to be repaired after at least four attempts, or has been thirty days out of service because of the nonconformity, request relief for the nonconformity before the lease term expires and the person purchases the vehicle.

¶ 40.   We also do not agree that, if a person entitled to relief under WIS. STAT. § 218.0171(2)(b)3 must demand relief during the term of the lease rather than after its expiration and the purchase of the vehicle, the delay of a manufacturer in responding to the demand may deprive the consumer of a remedy. If the person making the demand is a consumer as described in subd. (1)(b)4 when the demand is made, the consumer is entitled to the refund within thirty days of offering to return the motor vehicle. Subdivision (2)(cm)1. If the manufacturer does not provide the refund within that

[12] All persons defined as consumers under WIS. STAT. § 218.0171(1)(b), whether lessees or not and regardless of the length of the lease, must meet the time limits imposed under paras. (2)(a) and (b) before being entitled to relief under para. (2)(b): the consumer must report the nonconformity to the manufacturer, lessor, or authorized dealers and make it available to repair within one year or the warranty term, whichever is less, and the reasonable attempt at repair is also limited to that same time period. Section 218.0171(2)(a), (b) and (1)(h).

time period, there is a violation of the statute.[13] The subsequent lapse of time that occurs during resort to a dispute settlement procedure, *see* § 218.0171(4), and the filing of a court action under subsec. (7), does not alter the fact that a violation of the statute occurred.

¶ 41. In summary, we agree with the trial court's conclusion that once the lease term expired and Varda purchased the vehicle, he was no longer a consumer under WIS. STAT. § 218.0171(1)(b)4. Varda does not contend he was a consumer under any other definition.[14] Therefore, he was not entitled to any relief under para. (2)(b). It follows that when General Motors failed to provide within thirty days the relief he requested, it did not violate the statute. Accordingly, Varda has no claim for double damages under § 218.0171(7) as he contends. This subsection provides that, "[I]n addition to pursuing any other remedy, a consumer may bring an action to recover any damages caused by a violation of this section. . . ." The facts alleged in the complaint, taken as true, do not show a violation of the section,

---

[13] In *Church v. Chrysler Corp.*, 221 Wis. 2d 460, 468, 585 N.W.2d 685 (Ct. App. 1998), we held that the corresponding thirty-day time limit for refunds under WIS. STAT. § 218.0171(2)(c) is not suspended or delayed because the consumer does not agree that the amount of the refund offered by the manufacturer is correct: the manufacturer violates the statute if the refund is not made within the thirty days, even if items are in dispute and the manufacturer is attempting to resolve the dispute.

[14] By purchasing the vehicle, he did not become a purchaser under WIS. STAT. § 218.0171(1)(b)1 because he did not purchase a "new motor vehicle." *Schey v. Chrysler Corp.*, 228 Wis. 2d 483, 489–90, 597 N.W.2d 457 (Ct. App. 1999), *review denied*, 228 Wis. 2d 174, 602 N.W.2d 760 (Wis. Aug. 24, 1999) (No. 98–1277).

and the trial court therefore correctly dismissed the complaint.

*By the Court.*—Order affirmed.