# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-1211

_____

| | | |
|---|---|---|
| Mosheh Malik Louis, also known as Harry James Starks; Dearle Alexander, Jr.; David Allen; Billy Billups; Dennis S. Black; Donald L. Boggess; Rickey E. Bringus; Manuel J. Cabrera; George E. Carter; Vincent A. Carter; Trentelle A. Clifton; William Ray Cole; Anthony W. Coleman; Gerry D. Crawford; Carey G. Creelman; Eric L. Crudup; Ricky R. Davenport; Jaron Dean; Nuha Refid; Michael Fonville; Ronald N. Fort; Jerome J. Gilmore; Lester L. Glantz; Andre M. Gomez; David A. Graves; Larry D. Hardin; Marc Herrera, also known as Anthony Herrera; Larry D. James; Marvel Jones; Vincent Jones, Jr.; Elijah Jones; Leonard Jordan; John L. Lewis, also known as Rod Frazier; Reko Mitchell; Elezar Moreno; Charles Overguard; Robert W. Parker; Donald Patz, also known as Donald Scott; Leroy Parmer; Stanley A. Poe; Corey J. Prater; Kenneth N. Rhodes; Samuel L. Sanders; Larry B. Scott; Lord Shabazz; Tyrus T. Shelly; John D. Shemat; Larcell L. Starks; Robert Venable; Robert Dean Wiese; | * * * * * * * * * * * * * * * * * * * * * * * * * * * * * | Appeal from the United States District Court for the District of Nebraska. |

Fred White; Martize A. Williams;        *
Harvey Cass,                            *
                                        *
              Appellants,               *
                                        *
      v.                                *
                                        *
Department of Correctional Services     *
of Nebraska; Harold W. Clarke; Frank    *
Hopkins; Mike Kenny; Teresa             *
Predmore; Dallen E. Johnson; Pamela     *
Hillman; Susan Phinney; Kelly           *
Wubbels; Mark Danner; Matthew           *
Hinrichs; Scott Marshall; Michelle      *
Rose-Seeman; Brad Exstrom; Randy        *
Crosby; Joseph Posposol; Scott          *
Isherwood; Todd Haussler; Ronald        *
Bailey; Douglas Diltz; Karen Foster;    *
Michael Edison; George Green;           *
Claude R. Rinke; James Pierce; Brad     *
Hausen; Robert Treptow; Daniel T.       *
Higgins; Larry Stroud; Linda Leonard;   *
Matthew Galvin; Robert Madsen;          *
Daniel Schumaucher; Richard             *
Brittenham; Melvin Rouf; Barry W.       *
Loock; Diane Sabatka; Dennis Colyer;    *
Ronald L. Petersen; Unknown Cockrell,   *
in their individual and official        *
capacities,                             *
                                        *
              Appellees.                *

                    _____

              Submitted:  November 14, 2005
                  Filed:  February 3, 2006

                    _____

Before  ARNOLD, BEAM, and RILEY, Circuit Judges.

                    _____

                       -2-

ARNOLD, Circuit Judge.

Inmates and former inmates of the Nebraska Department of Correctional Services (DCS) appeal the judgment of the district court[1] denying their claim that DCS's method of collecting and testing urine samples for drug use violated their constitutional right to procedural due process. We affirm.

I.

This suit arises out of a program to eradicate drug use in the Nebraska State Penitentiary (NSP). The program requires inmates to provide urine samples to be tested for drug use. The samples are collected by correctional officers or case workers and submitted to a laboratory adjacent to the NSP hospital. The collector takes a sealed cup, shows it to the inmate, breaks the seal, and labels the cup with the inmate's correct name and number. The inmate then urinates in the cup in the presence of the collector and returns the cup to the collector. After the sample has been tested for specific gravity, the collector places a form reflecting receipt of the urine sample in an evidence box and takes the sample cup and its corresponding evidence card, which is used to record the chain of custody, to the NSP hospital, where the sample is refrigerated pending lab testing.

Trained laboratory technicians then test the urine using the fluorescence polarization immunoassay (FPIA) method. According to Dr. David Black, an expert witness testifying for the defendants, the FPIA test is approximately ninety-five percent accurate. If FPIA testing indicates that an inmate's sample contains drug metabolites, the technician reruns it. If a second such test confirms the presence of drugs and the inmate's medical records do not reflect the use of prescribed medications that could provide a false-positive result, the technician sends the specimen report and the evidence card to the prison disciplinary board. Nebraska law allows an inmate to request an independent test of his urine sample. That test is

---

[1]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska.

performed in a private laboratory using gas chromatography/mass spectrometry (GC/MS). GC/MS testing is more accurate and more expensive than the FPIA method and typically costs $30, although it can cost as much as $90, depending on the drug at issue. The inmate pays the cost of confirmatory GC/MS testing if the sample tests positive for drug metabolites. If a disciplinary complaint is filed against an inmate, a hearing before the disciplinary committee follows. While the inmate may call witnesses at this hearing, he may not call the laboratory technician who carried out the FPIA test. Instead, the technician provides a written statement of the procedures used in the lab.

The plaintiffs filed a complaint against NSP and prison officials under 42 U.S.C. § 1983, claiming that the drug-testing procedures followed at NSP violate their right to procedural due process because they impose a risk that inmates will be wrongfully deprived of good-time credits or placed in disciplinary segregation. We agree with the district court that NSP's procedures adequately protect the inmates' due process rights.

## II.

We assess the constitutionality of the procedures used to collect and analyze the inmates' urine samples by balancing the competing interests in play: "the private interest that will be affected by the official action; ... the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976).

The inmates possess a protected liberty interest in not being arbitrarily deprived of their good-time credits, and thus NSP must observe due process when the credits are in issue. *See Wolff v. McDonnell*, 418 U.S. 539, 556-58 (1974). Although due process rights are limited in the prison disciplinary context, they require, *inter alia*,

-4-

that good-time credits may be revoked only if the revocation is supported by "some evidence in the record." But due process requirements "are flexible and depend on a balancing of the interests affected by the relevant government action." *Superintendent v. Hill*, 472 U.S. 445, 454 (1985). Here, the prison has an interest in reducing drug use by inmates, but there are practical limits on how much money it can spend.

The plaintiffs first maintain that due process requires that the collection procedures be altered to allow the inmate himself to sign and seal the specimen after the prison collects it. The plaintiffs, however, offered no evidence that the current training and collection protocols have resulted in erroneous deprivations of good-time credits. The alterations in collection procedures that the plaintiffs request are small and would contribute only marginally to the accuracy of the test results, and the prison would incur costs for retraining if it changed the protocol. While the collection procedures may not be maximally drawn to eliminate mislabeled samples, they conform to practices used in private-sector workplace testing and are adequate to ensure reasonably reliable results. The Supreme Court has said that "federal courts ought to afford appropriate deference and flexibility to state [prison] officials trying to manage a volatile environment." *Sandin v. Conner*, 515 U.S. 472, 482 (1995). NSP officials have chosen to collect urine samples for drug testing in a particular manner, and absent evidence that this decision resulted in an unreasonable risk of inmates being deprived of good-time credits, we defer to their choice.

The inmates also argue that due process requires that the state conduct a GC/MS test on samples that test positive for drugs if the inmate does not admit to drug use when confronted. The contention is that NSP's refusal to fund confirmatory GC/MS testing after FPIA testing yields a positive result and the inmate denies using illicit drugs violates due process because GC/MS testing is not burdensome and unwarranted and would minimize errors. We have previously held that "[s]tates need not implement all possible procedural safeguards against erroneous deprivation of liberty when utilizing results of scientific testing devices in accusatory proceedings."

-5-

*Spence v. Farrier*, 807 F.2d 753, 756 (8th Cir. 1986).  In *Spence*, we rejected a due process challenge to a regime that allowed test results into evidence at prison disciplinary proceedings after urine samples were twice tested using a method that was ninety-five percent accurate.  *Id.* at 754-57; *see also Harmon v. Auger*, 768 F.2d 270, 276 (8th Cir. 1985).  The inmates in *Spence*, 807 F.2d at 754, were not permitted to have confirmatory testing done by another method or to call expert witnesses at the disciplinary hearing.  The FPIA test used here is ninety-five percent accurate, and a sample registering drug metabolites is subjected to a second FPIA test for confirmation before it is definitively considered to have registered positive for illicit drug use.  And, as we have said, under the Nebraska system inmates may obtain confirmatory testing at an independent laboratory, *see* Neb. Rev. Stat. § 83-4,114.02, and are required to pay for the GC/MS test only in the event that this test yields a positive result for drug metabolites.  The Nebraska regime thus provides more procedural safeguards than the one that we approved in *Spence*.  We therefore discern no constitutional infirmity in the arrangement challenged here.

Plaintiffs' final constitutional argument is that due process requires the admission at inmate disciplinary hearings of testimony from the technician who tested a urine sample, or test-specific documentation on how the technician processed the particular sample, before an inmate can be found guilty of a drug infraction.  But we believe that NSP's refusal to permit inmates to call lab technicians as witnesses is justified by the need to manage the environment of a prison and to maximize the productivity of the lab technicians in its employ.  We have upheld the admission of urinalysis laboratory reports at a parole hearing, finding that the reports bore "substantial indicia of reliability" and that the confrontation clause did not require the out-of-state chemist who performed the test to appear.  *See United States v. Bell*, 785 F.2d 640, 643 (8th Cir. 1986).  Here the unsworn statements provided to inmates subject to a disciplinary hearing for drug use outline the procedures used at the testing facility and the qualifications of the laboratory supervisor.  Since we have previously held that prison disciplinary hearings that did not include expert testimony did not

violate due process, *see Spence*, 807 F.2d at 756, we uphold NSP's restriction on evidentiary material in its disciplinary hearings.

## II.

The plaintiffs also contend that the district court abused its discretion by not prohibiting the defendants from using certain exhibits at trial. The defendants stated that they did not produce the exhibits in question, a collection of revised rules regulating the urine-sample collection and analysis protocols, until a few days before trial because defense counsel took maternity leave and had a busy schedule when she returned. The plaintiffs moved to exclude the exhibits from evidence, but the district judge instead ruled that if the evidence adduced at trial indicated that the exhibits were withheld for tactical reasons, the fact-finder could draw an adverse inference from the tardy production. At trial, the district court found that while the reasons that the defendants proffered for the untimely production of the new rules did not furnish a complete excuse, there was no evidence that the exhibits were withheld in bad faith; in addition, the court concluded that the plaintiffs were not prejudiced by the delay in production. We do not believe that the district court abused its discretion by imposing a conditional sanction or by ultimately admitting the exhibits.

## III.

For the reasons indicated, we affirm.

_____